# HARISIADES v. SHAUGHNESSY, DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION.

NO. 43.

Argued December 5, 1951.—Decided March 10, 1952.

*Richard F. Watt* argued the cause for petitioner in No. 43. With him on the brief was *Walter F. Dodd.*

*Jack Wasserman* argued the cause for appellant in No. 206. With him on the brief was *Filindo B. Masino.*

*David Rein* argued the cause for appellant in No. 264. With him on the brief was *Joseph Forer.*

*Robert L. Stern* argued the cause for respondent in No. 43 and appellees in Nos. 206 and 264. With him on the brief were *Solicitor General Perlman, Assistant Attorney General McInerney, Beatrice Rosenberg, John R. Wilkins* and. *Charles Gordon.*

MR. JUSTICE JACKSON delivered the opinion of the Court.

The ultimate question in these three cases is whether the United States constitutionally may deport a legally resident alien because of membership in the Communist Party which terminated before enactment of the Alien Registration Act, 1940.[1]

Harisiades, a Greek national, accompanied his father to the United States in 1916, when thirteen years of age, and has resided here since. He has taken a wife and sired two children, all citizens. He joined the Communist Party in 1925, when it was known as the Workers Party, and served as an organizer, Branch Executive Committee-

---

[1] 54 Stat. 670, 8 U. S. C. § 137.

man, secretary of its Greek Bureau, and editor of its paper "Empros." The party discontinued his membership, along with that of other aliens, in 1939, but he has continued association with members. He was familiar with the principles and philosophy of the Communist Party and says he still believes in them. He disclaims personal belief in use of force and violence and asserts that the party favored their use only in defense. A warrant for his deportation because of his membership was issued in 1930 but was not served until 1946. The delay was due to inability to locate him because of his use of a number of aliases. After hearings, he was ordered deported on the grounds that after entry he had been a member of an organization which advocates overthrow of the Government by force and violence and distributes printed matter so advocating. He sought release by habeas corpus, which was denied by the District Court.[2] The Court of Appeals for the Second Circuit affirmed.[3]

Mascitti, a citizen of Italy, came to this country in 1920, at the age of sixteen. He married a resident alien and has one American-born child. He was a member of the Young Workers Party, the Workers Party and the Communist Party between 1923 and 1929. His testimony was that he knew the party advocated a proletarian dictatorship, to be established by force and violence if the capitalist class resisted. He heard some speakers advocate violence, in which he says he did not personally believe, and he was not clear as to the party policy. He resigned in 1929, apparently because he lost sympathy with or interest in the party. A warrant for his deportation issued and was served in 1946. After the usual administrative hearings he was ordered deported on the same grounds as Harisiades. He sought relief by declaratory

[2] 90 F. Supp. 397.

[3] 187 F. 2d 137.

judgment, which was denied without opinion by a three-judge District Court for the District of Columbia. His case comes to this Court by direct appeal.

Mrs. Coleman, a native of Russia, was admitted to the United States in 1914, when thirteen years of age. She married an American citizen and has three children, citizens by birth. She admits being a member of the Communist Party for about a year, beginning in 1919, and again from 1928 to 1930, and again from 1936 to 1937 or 1938. She held no office and her activities were not significant. She disavowed much knowledge of party principles and program, claiming she joined each time because of some injustice the party was then fighting. The reasons she gives for leaving the party are her health and the party's discontinuance of alien memberships. She has been ordered deported because after entry she became a member of an organization advocating overthrow of the Government by force and violence. She sought an injunction on constitutional grounds, among others. Relief was denied, without opinion, by a three-judge District Court for the District of Columbia and her case also comes here by direct appeal.

Validity of the hearing procedures is questioned for noncompliance with the Administrative Procedure Act, which we think is here inapplicable.[4] Admittedly, each of these deportations is authorized and required by the letter, spirit and intention of the statute. But the Act

---

[4] Petitioner Harisiades and appellant Coleman contend that the proceedings against them must be nullified for failure to conform to the requirements of the Administrative Procedure Act, 60 Stat. 237, 5 U. S. C. § 1001 et seq. However, § 12 of the Act, 60 Stat. 244, 5 U. S. C. § 1011, provides that ". . . no procedural requirement shall be mandatory as to any agency proceeding initiated prior to the effective date of such requirement." The proceedings against Harisiades and Coleman were instituted before the effective date of the Act. Harisiades also contends that the Administrative Procedure Act

is assailed on three grounds: (1) that it deprives the aliens of liberty without due process of law in violation of the Fifth Amendment; (2) that it abridges their freedoms of speech and assembly in contravention of the First Amendment; and (3) that it is an *ex post facto* law which Congress is forbidden to pass by Art. I, § 9, cl. 3 of the Constitution.

We have in each case a finding, approved by the court below, that the Communist Party during the period of the alien's membership taught and advocated overthrow of the Government of the United States by force and violence. Those findings are not questioned here.

## I.

These aliens ask us to forbid their expulsion by a departure from the long-accepted application to such cases of the Fifth Amendment provision that no person shall be deprived of life, liberty or property without due process of law. Their basic contention is that admission for permanent residence confers a "vested right" on the alien, equal to that of the citizen, to remain within the country, and that the alien is entitled to constitutional protection in that matter to the same extent as the citizen. Their second line of defense is that if any power to deport domiciled aliens exists it is so dispersed that the judiciary must concur in the grounds for its exercise to the extent of finding them reasonable. The argument goes on to the contention that the grounds prescribed by the Act of 1940 bear no reasonable relation to protection of legitimate interests of the United States and concludes that

aside, he was denied procedural due process in that in his 1946–1947 hearings the same individual acted both as presiding officer and examining officer. However, it appears that the officer here performed both functions with Harisiades' consent. He, therefore, has no standing to raise the objection now.

the Act should be declared invalid. Admittedly these propositions are not founded in precedents of this Court.

For over thirty years each of these aliens has enjoyed such advantages as accrue from residence here without renouncing his foreign allegiance or formally acknowledging adherence to the Constitution he now invokes. Each was admitted to the United States, upon passing formidable exclusionary hurdles, in the hope that, after what may be called a probationary period, he would desire and be found desirable for citizenship. Each has been offered naturalization, with all of the rights and privileges of citizenship, conditioned only upon open and honest assumption of undivided allegiance to our Government.[5] But acceptance was and is not compulsory. Each has been permitted to prolong his original nationality indefinitely.

So long as one thus perpetuates a dual status as an American inhabitant but foreign citizen, he may derive advantages from two sources of law—American and international. He may claim protection against our Government unavailable to the citizen. As an alien he retains a claim upon the state of his citizenship to diplomatic intervention on his behalf, a patronage often of considerable value. The state of origin of each of these aliens could presently enter diplomatic remonstrance against these deportations if they were inconsistent with international law, the prevailing custom among nations or their own practices.

The alien retains immunities from burdens which the citizen must shoulder. By withholding his allegiance from the United States, he leaves outstanding a foreign

[5] 40 Stat. 548, as amended, 8 U. S. C. § 732 (a) (13), (16), (17), (18), (19); 61 Stat. 122, as amended, 8 U. S. C. § 735. But a certificate of naturalization is subject to revocation on the ground of fraud or other illegality in the procurement. 54 Stat. 1158, 8 U. S. C. § 738; *Knauer* v. *United States*, 328 U. S. 654.

call on his loyalties which international law not only permits our Government to recognize but commands it to respect. In deference to it certain dispensations from conscription for any military service have been granted foreign nationals.[6] They cannot, consistently with our international commitments, be compelled "to take part in the operations of war directed against their own country."[7] In addition to such general immunities they may enjoy particular treaty privileges.[8]

Under our law, the alien in several respects stands on an equal footing with citizens,[9] but in others has never been conceded legal parity with the citizen.[10] Most importantly, to protract this ambiguous status within the country is not his right but is a matter of permission and

---

[6] § 2 of the Selective Draft Act of 1917, 40 Stat. 76, as amended, 50 U. S. C. App. § 202; § 3 of the Selective Training and Service Act of 1940, 54 Stat. 885, as amended, 50 U. S. C. App. § 303; § 4 (a) of the Selective Service Act of 1948, 62 Stat. 604, as amended, 50 U. S. C. App. § 454 (a). Cf. *Moser* v. *United States*, 341 U. S. 41.

[7] Article 23, 1907 Hague Convention, Respecting the Laws and Customs of War on Land, 36 Stat. 2301–2302.

[8] Borchard, Diplomatic Protection of Citizens Abroad, 64.

[9] This Court has held that the Constitution assures him a large measure of equal economic opportunity, *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Truax* v. *Raich*, 239 U. S. 33; he may invoke the writ of habeas corpus to protect his personal liberty, *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 660; in criminal proceedings against him he must be accorded the protections of the Fifth and Sixth Amendments, *Wong Wing* v. *United States*, 163 U. S. 228; and, unless he is an enemy alien, his property cannot be taken without just compensation. *Russian Volunteer Fleet* v. *United States*, 282 U. S. 481.

[10] He cannot stand for election to many public offices. For instance, Art. I, § 2, cl. 2, § 3, cl. 3, of the Constitution respectively require that candidates for election to the House of Representatives and Senate be citizens. See Borchard, Diplomatic Protection of Citizens Abroad, 63. The states, to whom is entrusted the authority to set qualifications of voters, for most purposes require citizenship as a condition precedent to the voting franchise. The alien's right to

tolerance. The Government's power to terminate its hospitality has been asserted and sustained by this Court since the question first arose.[11]

War, of course, is the most usual occasion for extensive resort to the power. Though the resident alien may be personally loyal to the United States, if his nation becomes our enemy his allegiance prevails over his personal preference and makes him also our enemy, liable to expulsion or internment,[12] and his property becomes subject to seizure and perhaps confiscation.[13] But it does not require war to bring the power of deportation into existence or to authorize its exercise. Congressional apprehension of foreign or internal dangers short of war may lead to its use. So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.

That aliens remain vulnerable to expulsion after long residence is a practice that bristles with severities. But it is a weapon of defense and reprisal confirmed by international law as a power inherent in every sovereign

---

travel temporarily outside the United States is subject to restrictions not applicable to citizens. 43 Stat. 158, as amended, 8 U. S. C. § 210. If he is arrested on a charge of entering the country illegally, the burden is his to prove "his right to enter or remain"—no presumptions accrue in his favor by his presence here. 39 Stat. 889, as amended, 8 U. S. C. § 155 (a).

[11] Fong Yue Ting v. United States, 149 U. S. 698, 707, 711–714, 730; Lem Moon Sing v. United States, 158 U. S. 538, 545–546; Li Sing v. United States, 180 U. S. 486, 494–495; Fok Yung Yo v. United States, 185 U. S. 296, 302; The Japanese Immigrant Case, 189 U. S. 86, 97; United States v. Ju Toy, 198 U. S. 253, 261; Zakonaite v. Wolf, 226 U. S. 272, 275; Tiaco v. Forbes, 228 U. S. 549, 556–557; Bugajewitz v. Adams, 228 U. S. 585, 591.

[12] 40 Stat. 531, 50 U. S. C. § 21.

[13] 40 Stat. 411, 50 U. S. C. App. § 2 (c); 40 Stat. 415, 50 U. S. C. App. § 6; 62 Stat. 1246, 50 U. S. C. App. § 39; Guessefeldt v. McGrath, 342 U. S. 308.

state.[14]   Such is the traditional power of the Nation over
the alien and we leave the law on the subject as we find it.

This brings us to the alternative defense under the
Due Process Clause—that, granting the power, it is so
unreasonably and harshly exercised by this enactment
that it should be held unconstitutional.

In historical context the Act before us stands out as
an extreme application of the expulsion power.   There
is no denying that as world convulsions have driven us
toward a closed society the expulsion power has been
exercised with increasing severity, manifest in multiplica-
tion of grounds for deportation, in expanding the subject
classes from illegal entrants to legal residents, and in
greatly lengthening the period of residence after which
one may be expelled.[15]   This is said to have reached a
point where it is the duty of this Court to call a halt upon
the political branches of the Government.

It is pertinent to observe that any policy toward aliens
is vitally and intricately interwoven with contempora-

---

[14] ". . . [I]n strict law, a State can expel even domiciled aliens
without so much as giving the reasons, the refusal of the expelling
State to supply the reasons for expulsion to the home State of the
expelled alien does not constitute an illegal, but only a very un-
friendly act."   1 Oppenheim, International Law (3d ed., Roxburgh,
1920), 498–502, at 499.   But cf. 1 Oppenheim, International Law (7th
ed., Lauterpacht, 1948), 630–634, at 631.   See also 4 Moore, Inter-
national Law Digest, 67–96, citing examples; Wheaton's International
Law (6th ed., Keith, 1929), 210–211; *Fong Yue Ting* v. *United States,*
149 U. S. 698.

[15] An open door to the immigrant was the early federal policy.
It began to close in 1884 when Orientals were excluded.   23 Stat. 115.
Thereafter, Congress has intermittently added to the excluded classes,
and as rejections at the border multiplied illegal entries increased.
To combat these, recourse was had to deportation in the Act of 1891,
26 Stat. 1086.   However, that Act could be applied to an illegal
entrant only within one year after his entry.   Although that time
limitation was subsequently extended, 32 Stat. 1218; 34 Stat. 904–905,

neous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.[16]

These restraints upon the judiciary, occasioned by different events, do not control today's decision but they

---

until after the turn of the century expulsion was used only as an auxiliary remedy to enforce exclusion.

Congress, in 1907, provided for deportation of legally resident aliens, but the statute reached only women found engaging in prostitution, and deportation proceedings were authorized only within three years after entry.

From those early steps, the policy has been extended. In 1910, new classes of resident aliens were listed for deportation, including for the first time political offenders such as anarchists and those believing in or advocating the overthrow of the Government by force and violence. 36 Stat. 264. In 1917, aliens who were found after entry to be advocating anarchist doctrines or the overthrow of the Government by force and violence were made subject to deportation, a five-year time limit being retained. 39 Stat. 889. A year later, deportability because of membership in described subversive organizations was introduced. 40 Stat. 1012; 41 Stat. 1008. When this Court, in 1939, held that that Act reached only aliens who were members when the proceedings against them were instituted, *Kessler* v. *Strecker*, 307 U. S. 22, Congress promptly enacted the statute before us, making deportation mandatory for all aliens who at any time past have been members of the proscribed organizations. In so doing it also eliminated the time limit for institution of proceedings thereunder. Alien Registration Act, 1940, 54 Stat. 670, 673.

[16] *United States* v. *Curtiss-Wright Corp.*, 299 U. S. 304, 319–322; *Chicago & Southern Air Lines, Inc.* v. *Waterman Steamship Corp.*, 333 U. S. 103, 111; U. S. Const., Art. IV, § 4; *Luther* v. *Borden*, 7 How. 1, 42; *Pacific Telephone Co.* v. *Oregon*, 223 U. S. 118; *Marshall* v. *Dye*, 231 U. S. 250. In respect to the war power over even citizens, see *Hirabayashi* v. *United States*, 320 U. S. 81, 92; *Korematsu* v. *United States*, 323 U. S. 214, 217–218. That English courts also refuse to review grounds for deportation orders appears from *Rex* v. *Home Secretary; Ex parte Bressler*, 27 Cox Cr. Ca. 655.

are pertinent. It is not necessary and probably not possible to delineate a fixed and precise line of separation in these matters between political and judicial power under the Constitution. Certainly, however, nothing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require us to equate our political judgment with that of Congress.

Under the conditions which produced this Act, can we declare that congressional alarm about a coalition of Communist power without and Communist conspiracy within the United States is either a fantasy or a pretense? This Act was approved by President Roosevelt June 28, 1940, when a world war was threatening to involve us, as soon it did. Communists in the United States were exerting every effort to defeat and delay our preparations. Certainly no responsible American would say that there were then or are now no possible grounds on which Congress might believe that Communists in our midst are inimical to our security.

Congress received evidence that the Communist movement here has been heavily laden with aliens and that Soviet control of the American Communist Party has been largely through alien Communists. It would be easy for those of us who do not have security responsibility to say that those who do are taking Communism too seriously and overestimating its danger. But we have an Act of one Congress which, for a decade, subsequent Congresses have never repealed but have strengthened and extended. We, in our private opinions, need not concur in Congress' policies to hold its enactments constitutional. Judicially we must tolerate what personally we may regard as a legislative mistake.

We are urged, because the policy inflicts severe and undoubted hardship on affected individuals, to find a re-

straint in the Due Process Clause. But the Due Process Clause does not shield the citizen from conscription and the consequent calamity of being separated from family, friends, home and business while he is transported to foreign lands to stem the tide of Communism. If Communist aggression creates such hardships for loyal citizens, it is hard to find justification for holding that the Constitution requires that its hardships must be spared the Communist alien. When citizens raised the Constitution as a shield against expulsion from their homes and places of business, the Court refused to find hardship a cause for judicial intervention.[17]

We think that, in the present state of the world, it would be rash and irresponsible to reinterpret our fundamental law to deny or qualify the Government's power of deportation. However desirable world-wide amelioration of the lot of aliens, we think it is peculiarly a subject for international diplomacy. It should not be initiated by judicial decision which can only deprive our own Government of a power of defense and reprisal without obtaining for American citizens abroad any reciprocal privileges or immunities. Reform in this field must be entrusted to the branches of the Government in control of our international relations and treaty-making powers.

We hold that the Act is not invalid under the Due Process Clause. These aliens are not entitled to judicial relief unless some other constitutional limitation has been transgressed, to which inquiry we turn.

## II.

The First Amendment is invoked as a barrier against this enactment. The claim is that in joining an organization advocating overthrow of government by force and

---

[17] *Hirabayashi* v. *United States,* 320 U. S. 81; *Korematsu* v. *United States,* 323 U. S. 214.

violence the alien has merely exercised freedoms of speech, press and assembly which that Amendment guarantees to him.

The assumption is that the First Amendment allows Congress to make no distinction between advocating change in the existing order by lawful elective processes and advocating change by force and violence, that freedom for the one includes freedom for the other, and that when teaching of violence is denied so is freedom of speech.

Our Constitution sought to leave no excuse for violent attack on the status quo by providing a legal alternative—attack by ballot. · To arm all men for orderly change, the Constitution put in their hands a right to influence the electorate by press, speech and assembly. This means freedom to advocate or promote Communism by means of the ballot box, but it does not include the practice or incitement of violence.[18]

True, it often is difficult to determine whether ambiguous speech is advocacy of political methods or subtly shades into a methodical but prudent incitement to violence. Communist governments avoid the inquiry by suppressing everything distasteful. Some would have us avoid the difficulty by going to the opposite extreme of permitting incitement to violent overthrow at least unless it seems certain to succeed immediately. We apprehend that the Constitution enjoins upon us the duty, however difficult, of distinguishing between the two. Different formulae have been applied in different situations and the test applicable to the Communist Party has been stated too recently to make further discussion at this time profitable.[19] We think the First Amendment does not prevent the deportation of these aliens.

---

[18] *Dennis* v. *United States,* 341 U. S. 494.

[19] *Ibid.*

## III.

The remaining claim is that this Act conflicts with Art. I, § 9, of the Constitution forbidding *ex post facto* enactments. An impression of retroactivity results from reading as a new and isolated enactment what is actually a continuation of prior legislation.

During all the years since 1920 Congress has maintained a standing admonition to aliens, on pain of deportation, not to become members of any organization that advocates overthrow of the United States Government by force and violence, a category repeatedly held to include the Communist Party. These aliens violated that prohibition and incurred liability to deportation. They were not caught unawares by a change of law. There can be no contention that they were not adequately forewarned both that their conduct was prohibited and of its consequences.

In 1939, this Court decided *Kessler* v. *Strecker,* 307 U. S. 22, in which it was held that Congress, in the statute as it then stood, had not clearly expressed an intent that Communist Party membership remained cause for deportation after it ceased.[20] The Court concluded that in the absence of such expression only contemporaneous membership would authorize deportation.

The reaction of the Communist Party was to drop aliens from membership, at least in form, in order to immunize them from the consequences of their party membership.

The reaction of Congress was that the Court had misunderstood its legislation. In the Act here before us it supplied unmistakable language that past violators of its prohibitions continued to be deportable in spite of resignation or expulsion from the party. It regarded the fact

---

[20] 40 Stat. 1012.

that an alien defied our laws to join the Communist Party as an indication that he had developed little comprehension of the principles or practice of representative government or else was unwilling to abide by them.

However, even if the Act were found to be retroactive, to strike it down would require us to overrule the construction of the *ex post facto* provision which has been followed by this Court from earliest times. It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment.[21] Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure.[22] Both of these doctrines as original proposals might be debatable, but both have been considered closed for many years and a body of statute and decisional law has been built upon them. In *Bugajewitz* v. *Adams,* 228 U. S. 585, 591, Mr. Justice Holmes, for the Court, said: "It is thoroughly established that Congress has power to order the deportation of aliens whose presence in the country it deems hurtful. The determination by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment; it is simply a refusal by the Government to harbor persons whom it does not want. The coincidence of the local penal law with the policy of Congress is an accident. . . . The prohibition of *ex post facto* laws in Article I, § 9, has no application . . . and with regard to the petitioner it is not necessary to construe the statute as having any retrospective effect." Later, the Court said, "It is well settled that deportation, while it may be burdensome and severe for

---

[21] *Calder* v. *Bull,* 3 Dall. 386, 390; *Johannessen* v. *United States,* 225 U. S. 227, 242.

[22] *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730; *Bugajewitz* v. *Adams,* 228 U. S. 585, 591; *Bilokumsky* v. *Tod,* 263 U. S. 149, 154.

the alien, is not a punishment. . . . The inhibition against the passage of an *ex post facto* law by Congress in § 9 of Article I of the Constitution applies only to criminal laws . . . and not to a deportation act like this . . . ." *Mahler* v. *Eby*, 264 U. S. 32, 39.

It is urged against the foregoing opinions that in a few cases the *ex post facto* prohibition had been applied to what appeared to be civil disabilities. *Fletcher* v. *Peck*, 6 Cranch 87; *Cummings* v. *Missouri*, 4 Wall. 277; *Ex parte Garland*, 4 Wall. 333; *Pierce* v. *Carskadon*, 16 Wall. 234. The Court has since explained that those cases proceeded from the view that novel disabilities there imposed upon citizens were really criminal penalties for which civil form was a disguise. *Burgess* v. *Salmon*, 97 U. S. 381, 385. Those cases were known to the Justices who promulgated the above-quoted opinions but have never been considered to govern deportation. The facts of this case afford no basis for reconsidering or modifying the long-settled doctrine.

It is contended that this policy allows no escape by reformation. We are urged to apply some doctrine of atonement and redemption. Congress might well have done so, but it is not for the judiciary to usurp the function of granting absolution or pardon. We cannot do so for deportable ex-convicts, even though they have served a term of imprisonment calculated to bring about their reformation.

When the Communist Party as a matter of party strategy formally expelled alien members en masse, it destroyed any significance that discontinued membership might otherwise have as indication of change of heart by the individual. Congress may have believed that the party tactics threw upon the Government an almost impossible burden if it attempted to separate those who sincerely renounced Communist principles of force and violence from those who left the party the better to serve

it.   Congress, exercising the wide discretion that it alone has in these matters, declined to accept that as the Government's burden.

We find none of the constitutional objections to the Act well founded.   The judgments accordingly are

*Affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, concurring.

It is not for this Court to reshape a world order based on politically sovereign States.   In such an international ordering of the world a national State implies a special relationship of one body of people, *i. e.,* citizens of that State, whereby the citizens of each State are aliens in relation to every other State.   Ever since national States have come into being, the right of people to enjoy the hospitality of a State of which they are not citizens has been a matter of political determination by each State. (I put to one side the oddities of dual citizenship.) Though as a matter of political outlook and economic need this country has traditionally welcomed aliens to come to its shores, it has done so exclusively as a matter of political outlook and national self-interest.   This policy has been a political policy, belonging to the political branch of the Government wholly outside the concern and the competence of the Judiciary.

Accordingly, when this policy changed and the political and law-making branch of this Government, the Congress, decided to restrict the right of immigration about seventy years ago, this Court thereupon and ever since has recognized that the determination of a selective and exclusionary immigration policy was for the Congress and not for the Judiciary.   The conditions for entry of every alien,

the particular classes of aliens that shall be denied entry altogether, the basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.

The Court's acknowledgment of the sole responsibility of Congress for these matters has been made possible by Justices whose cultural outlook, whose breadth of view and robust tolerance were not exceeded by those of Jefferson. In their personal views, libertarians like Mr. Justice Holmes and Mr. Justice Brandeis doubtless disapproved of some of these policies, departures as they were from the best traditions of this country and based as they have been in part on discredited racial theories or manipulation of figures in formulating what is known as the quota system. But whether immigration laws have been crude and cruel, whether they may have reflected xenophobia in general or anti-Semitism or anti-Catholicism, the responsibility belongs to Congress. Courts do enforce the requirements imposed by Congress upon officials in administering immigration laws, *e. g.,* *Kwock Jan Fat* v. *White,* 253 U. S. 454, and the requirement of Due Process may entail certain procedural observances. *E. g., Ng Fung Ho* v. *White,* 259 U. S. 276. But the underlying policies of what classes of aliens shall be allowed to enter and what classes of aliens shall be allowed to stay, are for Congress exclusively to determine even though such determination may be deemed to offend American traditions and may, as has been the case, jeopardize peace.

In recognizing this power and this responsibility of Congress, one does not in the remotest degree align oneself with fears unworthy of the American spirit or with

hostility to the bracing air of the free spirit. One merely recognizes that the place to resist unwise or cruel legislation touching aliens is the Congress, not this Court.

I, therefore, join in the Court's opinion in these cases.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

There are two possible bases for sustaining this Act:

(1) A person who was once a Communist is tainted for all time and forever dangerous to our society; or

(2) Punishment through banishment from the country may be placed upon an alien not for what he did, but for what his political views once were.

Each of these is foreign to our philosophy. We repudiate our traditions of tolerance and our articles of faith based upon the Bill of Rights when we bow to them by sustaining an Act of Congress which has them as a foundation.

The view that the power of Congress to deport aliens is absolute and may be exercised for any reason which Congress deems appropriate rests on *Fong Yue Ting* v. *United States,* 149 U. S. 698, decided in 1893 by a six-to-three vote. That decision seems to me to be inconsistent with the philosophy of constitutional law which we have developed for the protection of resident aliens. We have long held that a resident alien is a "person" within the meaning of the Fifth and the Fourteenth Amendments. He therefore may not be deprived either by the National Government or by any state of life, liberty, or property without due process of law. Nor may he be denied the equal protection of the laws. A state was not allowed to exclude an alien from the laundry business because he was a Chinese,[1] nor discharge him from employment because

---

[1] *Yick Wo* v. *Hopkins,* 118 U. S. 356.

he was not a citizen,[2] nor deprive him of the right to fish because he was a Japanese ineligible to citizenship.[3] An alien's property (provided he is not an enemy alien), may not be taken without just compensation.[4] He is entitled to habeas corpus to test the legality of his restraint,[5] to the protection of the Fifth and Sixth Amendments in criminal trials,[6] and to the right of free speech as guaranteed by the First Amendment.[7]

An alien, who is assimilated in our society, is treated as a citizen so far as his property and his liberty are concerned. He can live and work here and raise a family, secure in the personal guarantees every resident has and safe from discriminations that might be leveled against him because he was born abroad. Those guarantees of liberty and livelihood are the essence of the freedom which this country from the beginning has offered the people of all lands. If those rights, great as they are, have constitutional protection, I think the more important one—the right to remain here—has a like dignity.

The power of Congress to exclude, admit, or deport aliens flows from sovereignty itself and from the power "To establish an uniform Rule of Naturalization." U. S. Const., Art. I, § 8, cl. 4. The power of deportation is therefore an *implied* one. The right to life and liberty is an *express* one. Why this *implied* power should be given priority over the *express* guarantee of the Fifth Amendment has never been satisfactorily answered. Mr. Justice Brewer's dissent in *Fong Yue Ting* v. *United States, supra,* pp. 737–738, grows in power with the passing years: "It is said that the power here asserted is inherent in

[2] *Truax* v. *Raich*, 239 U. S. 33.

[3] *Takahashi* v. *Fish & Game Commission*, 334 U. S. 410.

[4] *Russian Volunteer Fleet* v. *United States*, 282 U. S. 481.

[5] *Ekiu* v. *United States*, 142 U. S. 651, 660.

[6] *Wong Wing* v. *United States*, 163 U. S. 228.

[7] *Bridges* v. *California*, 314 U. S. 252.

sovereignty. This doctrine of powers inherent in sovereignty is one both indefinite and dangerous. Where are the limits to such powers to be found, and by whom are they to be pronounced? Is it within legislative capacity to declare the limits? If so, then the mere assertion of an inherent power creates it, and despotism exists. May the courts establish the boundaries? Whence do they obtain the authority for this? Shall they look to the practices of other nations to ascertain the limits? The governments of other nations have elastic powers—ours is fixed and bounded by a written constitution. The expulsion of a race may be within the inherent powers of a despotism. History, before the adoption of this Constitution, was not destitute of examples of the exercise of such a power; and its framers were familiar with history, and wisely, as it seems to me, they gave to this government no general power to banish. Banishment may be resorted to as punishment for crime; but among the powers reserved to the people and not delegated to the government is that of determining whether whole classes in our midst shall, for no crime but that of their race and birthplace, be driven from our territory."

The right to be immune from arbitrary decrees of banishment certainly may be more important to "liberty" than the civil rights which all aliens enjoy when they reside here. Unless they are free from arbitrary banishment, the "liberty" they enjoy while they live here is indeed illusory. Banishment is punishment in the practical sense. It may deprive a man and his family of all that makes life worth while. Those who have their roots here have an important stake in this country. Their plans for themselves and their hopes for their children all depend on their right to stay. If they are uprooted and sent to lands no longer known to them, no longer hospitable, they become displaced, homeless people condemned to bitterness and despair.

This drastic step may at times be necessary in order to protect the national interest. There may be occasions when the continued presence of an alien, no matter how long he may have been here, would be hostile to the safety or welfare of the Nation due to the nature of his conduct. But unless such condition is shown, I would stay the hand of the Government and let those to whom we have extended our hospitality and who have become members of our communities remain here and enjoy the life and liberty which the Constitution guarantees.

Congress has not proceeded by that standard. It has ordered these aliens deported not for what they are but for what they once were. Perhaps a hearing would show that they continue to be people dangerous and hostile to us. But the principle of forgiveness and the doctrine of redemption are too deep in our philosophy to admit that there is no return for those who have once erred.