United States Court of Appeals,

Eleventh Circuit.

Nos. 94-8154, 95-8143.

UNITED STATES of America, Plaintiff-Appellee,

v.

Henry Olushola OBOH, a/k/a Henry Osa Omoboh, a/k/a James Clark a/k/a Derick Forest, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Mitchel Augustus BOWEN, Defendant-Appellant.

Aug. 8, 1996.

Appeals from the United States District Court for the Northern District of Georgia. (No. 1:93-00318-CR-1), Richard C. Freeman, Judge.

Before TJOFLAT, Chief Judge, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges, and HENDERSON[*], Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this consolidated appeal, the *en banc* court decides that it will not overturn *United States v. Chukwura,* 5 F.3d 1420 (11th Cir.1993), *cert. denied,* --- U.S. ----, 115 S.Ct. 102, 130 L.Ed.2d 51 (1994).

In *Chukwura,* a panel of this court held that 18 U.S.C. § 3583(d) authorized a district court to order the deportation of a defendant "subject to deportation" as a condition of supervised release. *Chukwura,* 5 F.3d at 1423. Prior to the panel's opinion in *Chukwura,* the First Circuit held that district courts lacked

[*]Senior U.S. Circuit Judge Albert J. Henderson has elected to participate in the decision in case No. 94-8154 pursuant to 28 U.S.C. § 46(c).

authority under section 3583(d) to order deportation and that section 3583(d) merely permitted the district court to order the surrender of the defendant to the Immigration and Naturalization Service (INS) to receive process in accordance with the Immigration and Nationality Act. *See United States v. Sanchez,* 923 F.2d 236 (1st Cir.1991). Since *Chukwura,* the Fourth and Fifth Circuits have also addressed this issue and joined the First Circuit in holding that section 3583(d) does not permit district courts to order deportation as a condition of supervised release. *See United States v. Xiang,* 77 F.3d 771 (4th Cir.1996); *see also United States v. Quaye,* 57 F.3d 447 (5th Cir.1995). In light of the Fourth and Fifth Circuits' recent rejection of the panel's holding in *Chukwura,* a majority of judges in regular active service voted to address this issue *en banc* in these cases.

FACTS AND PROCEDURAL HISTORY

In March 1989, Mitchel Augustus Bowen pleaded guilty to a two-count criminal indictment charging him with false representation of United States citizenship in violation of 18 U.S.C. § 911 and possession of a firearm as a convicted felon in violation of 18 U.S.C. § 992(g). After accepting Bowen's plea of guilty, the district court sentenced Bowen to a term of imprisonment and ordered, as a condition of supervised release, the surrender of Bowen to the Immigration and Naturalization Service (INS) for deportation proceedings. After Bowen served the sentence, INS began deportation proceedings. On April 15, 1993, INS returned Bowen to Jamaica, his native country. Bowen, however, reentered the United States approximately one year later. On

October 11, 1994, INS agents received a "tip" that Bowen was living in a hotel in Marietta, Georgia.  INS agents went to the hotel and arrested Bowen for unlawful reentry into the United States.  Pursuant to a lawful search warrant, the agents seized approximately seven ounces of marijuana from a briefcase located underneath the bed.

On November 3, 1994, the government filed a two-count criminal information in the Northern District of Georgia charging Bowen in Count I with violation of 8 U.S.C. § 1326, alleging that he unlawfully reentered the United States after having been deported.  Count II of the information charged Bowen with possession of marijuana in violation of 21 U.S.C. § 844.  Bowen subsequently entered a negotiated plea of guilty to both counts.  On January 24, 1995, the district court sentenced Bowen to concurrent terms of fifteen months and twelve months imprisonment for illegal reentry and drug possession.  As a condition of supervised release, the district court ordered the deportation of Bowen from the United States after completion of the term of imprisonment.  Bowen objected to the district court's deportation order and requested the court to withhold its order to allow INS to determine whether he should be deported based on his claim of eligibility for asylum under the Immigration and Nationality Act.

In the other case, a confidential informant informed INS that Henry Olushola Oboh manufactured fraudulent driver's licenses.  On June 9, 1993, the confidential informant introduced an undercover INS agent to Oboh.  During this meeting, the agent agreed to purchase two fraudulent driver's licenses from Oboh for $600.

Oboh, equipped with a portable camera, driver's licenses, laminating machine, and a red drop cloth, took the picture of the undercover agent and created two North Carolina licenses. A short time later, law enforcement agents arrested Oboh.

On September 17, 1993, Oboh pleaded guilty to two counts of producing false identification documents in violation of 18 U.S.C. § 1028(a)(1) in the Northern District of Georgia. On January 28, 1994, the district court sentenced Oboh to concurrent terms of eight months imprisonment for each count. As a condition of supervised release, the district court ordered that the government deport Oboh from the United States pursuant to 18 U.S.C. § 3583(d), that the government deliver Oboh to the duly authorized immigration official for such deportation, and that Oboh remain in the custody of the Immigration and Naturalization Service until deported. Oboh timely objected to the district court's order of deportation arguing that the PSI did not include a recommendation for deportation or any information regarding Oboh's immigration status. With respect to Oboh's immigration status, the presentence report (PSI) revealed that Oboh was born in Ibadan, Nigeria, on December 2, 1952, and entered the United States in 1974.

Oboh and Bowen filed separate appeals challenging the district court's authority to deport as a condition of supervised release under 18 U.S.C. § 3583(d). Oboh also challenges the district court's determination that he was subject to deportation. This court on its own motion consolidated these cases for the purpose of this appeal.

DISCUSSION

In *Chukwura,* a panel of this court addressed for the first time in this circuit the question of whether section 3583(d) authorizes a district court to order the deportation of a defendant "subject to deportation" as a condition of supervised release. *Chukwura,* 5 F.3d at 1420. After reviewing the plain language of section 3583(d), the *Chukwura* panel concluded that Congress intended to grant district courts the authority to deport defendants "subject to deportation" as a condition of supervised release. *Chukwura,* 5 F.3d at 1423. Before the panel, the government argued that the plain language of the statute should be followed. Now, appellants, Oboh and Bowen, and the government contend on appeal that *Chukwura* was wrongly decided and urge this *en banc* court to overrule *Chukwura.* Recognizing that only this court sitting *en banc* or a Supreme Court decision can overrule a prior decision of this circuit, we agreed to address this issue. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

We begin our analysis as the panel did in *Chukwura* and examine the plain language of section 3583(d). Section 3583(d) provides in pertinent part: "If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation." 18 U.S.C. § 3583(d) (1988). We find this language clear and unequivocal. The language states that a sentencing court may require that a defendant "subject to deportation" be deported as a condition of supervised release and

order the surrender of the defendant to INS for such deportation. This court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete.' " *Germain,* 503 U.S. at 254, 112 S.Ct. at 1149 (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701-02, 66 L.Ed.2d 633 (1981)); *see also United States v. McLymont,* 45 F.3d 400, 401 (11th Cir.) (the plain meaning of a statute controls unless the language of the statute is ambiguous or would lead to an absurd result), *cert. denied,* --- U.S. ----, 115 S.Ct. 1723, 131 L.Ed.2d 581 (1995); *Williams v. NEC Corp.,* 931 F.2d 1493, 1498 (11th Cir.1991) (same). Despite the plain language of this statute, appellants and the government now argue to the *en banc* court that Congress did not intend to grant district courts authority to deport because the plain meaning of section 3583(d) would in effect deny defendants the opportunity to challenge a deportation order under the administrative procedures of the Immigration and Nationality Act. 8 U.S.C. §§ 1101-1557 (1994). In support of their argument, they note that other circuits addressing this issue have held that section 3583(d) merely authorizes the district court to order the surrender of a defendant to INS for deportation proceedings in accordance with the Immigration and Nationality Act. The First, Fourth, and Fifth Circuits have each accepted arguments similar to the arguments appellants and the government make in this case. Consequently, we turn our attention

to the decisions in those circuits.

The First Circuit in *United States v. Sanchez* was the first to address the issue of whether section 3583(d) authorized district courts to order deportation as a condition of supervised release. *Sanchez,* 923 F.2d 236. In *Sanchez,* the district court ordered the defendant upon his release from confinement to " "be deported in accordance with 18 U.S.C. [§] 3583(d).' " *Sanchez,* 923 F.2d at 237. On appeal, the defendant argued that the district court entered an invalid order because a reasonable person could interpret the order to mean that the government could deport him without a INS deportation hearing. The First Circuit agreed. Finding "no indication of a contrary legislative design," the *Sanchez* court read section 3583(d) in conjunction with the provisions of the Immigration and Nationality Act.[1] *Sanchez,* 923 F.2d at 237.

The Fifth Circuit also addressed this issue in *United States v. Quaye* and held that courts lacked authority to order deportation under section 3583(d). *Quaye,* 57 F.3d 447. In explaining its holding, the *Quaye* court noted that Congress had not granted the

---

[1]The *Sanchez* court amended the district court's order to state:

> As a condition of supervised release upon the completion of his term of imprisonment the defendant is to be surrendered to a duly authorized immigration official for deportation in accordance with the established procedures provided by the Immigration and Naturalization Act, 8 U.S.C. §§ 1101 *et seq.* As further condition of supervised release if ordered deported defendant shall remain outside the United States.

*Sanchez,* 923 F.2d at 237.

Judicial Branch authority to deport at anytime prior to the enactment of section 3583(d). *Quaye,* 57 F.3d at 449-50. The court also reasoned that the history of the predecessor of section 3583(d), along with prior absence of congressional authority for judicial deportation, supported the conclusion that Congress never intended to alter the traditional allocation of "deportation" power between the Executive and Judicial Branches of government.[2] The *Quaye* court noted that section 3583(d)'s predecessor, enacted in 1931,

> permitted deportation of an alien prisoner in spite of the then-current parole rule that demanded that a prisoner remain within the court jurisdiction. Far from empowering the Parole Board to usurp the Executive Branch's deportation power, the 1931 Act only provided a means by which an alien could be deported upon parole.

*Quaye,* 57 F.3d at 450.[3] Based on the similarity of the language in

---

[2]Specifically, the *Quaye* court stated:

> We insist on greater clarity of purpose when a statute would be read to upset a status quo long in place. Indeed, here, the history of the statute is a powerful argument that Congress never intended to alter this traditional allocation of power between the Article II and Article III branches of government.

*Quaye,* 57 F.3d at 450.

[3]The 1931 Act, the predecessor to section 3583(d), provides in pertinent part:

> where a Federal prisoner is an alien and subject to deportation the [B]oard of [P]arole may authorize the release of such prisoner after he shall have become eligible for parole on [the] condition that he be deported and remain outside of the United States and all places subject to its jurisdiction, and upon such parole becoming effective said prisoner shall be delivered to duly authorized immigration official for deportation.

*Quaye,* 57 F.3d at 450 (quoting Law of March 2, 1931, ch. 371, 46 Stat. 1469).

the 1931 Act and section 3583(d), the *Quaye* court found that section 3583(d) codified the 1931 Act. *Quaye,* 57 F.3d at 450. Consequently, it concluded that section 3583(d) only "paves the way for Executive [B]ranch deportation proceedings" and "does not permit courts to order deportation alone." *Quaye,* 57 F.3d at 450.

Even more recently, the Fourth Circuit in *United States v. Xiang* interpreted the meaning of section 3583(d) "in the context of the overall scheme for the deportation of aliens" and held that district courts lack authority to order deportation as a condition of supervised release. *Xiang,* 77 F.3d at 772. In explaining its holding, the court in *Xiang* also found that its interpretation of section 3583(d) adhered to the "division of responsibility that Congress created between the INS and the court." *Xiang,* 77 F.3d at 773.

Like other courts that have addressed this issue, we believe it is instructive to look at the allocation of the power between the Executive and Judicial Branches with respect to deportation in determining whether Congress intended to grant courts authority to deport when it enacted section 3583(d). The First, Fourth, and Fifth Circuits' analysis, however, fails to recognize important congressional action that occurred before and after the enactment of section 3583(d). As previously noted, the Executive Branch, prior to the enactment of section 3583(d), had exclusive authority to order the deportation of a convicted alien "subject to deportation."[4] The Executive Branch's authority to deport,

_____

[4]Article I, Section 8, Clause 4 of the Constitution grants Congress exclusive authority to formulate the United States immigration policy. Congress enacted its first law dealing with

however, was not unlimited. The Judicial Branch, for over seventy-five years, possessed the power to thwart INS's ability to deport when the grounds for deportation involved a single conviction of a crime of moral turpitude which resulted in a sentence exceeding one year or where the alien subject to deportation committed two unrelated crimes of moral turpitude. *See United States v. Sanchez-Guzman,* 744 F.Supp. 997, 999 n. 5 (E.D.Wash.1990). Under such circumstances, a district court could issue a judicial recommendation against deportation (JRAD) to INS to prevent INS from finding an alien deportable or excludable on the basis of that conviction.[5] A JRAD once properly entered with

deportation in 1798 with the passage of the Alien Act of June 25, 1798. Frank L. Auerbach, Immigration Laws of the United States 1 (Bobbs-Merrill Co., Inc.1955). The 1798 Act authorized the President to deport aliens who he "deemed dangerous" to the United States. Auerbach, at 2. This Act expired in 1800. From 1798 to the enactment of section 3583(d) in 1987, the Executive Branch retained exclusive authority to order the deportation of aliens.

[5]In 1940, for example, 8 U.S.C. § 155 provided in pertinent part:

> The provision of this section respecting the deportation of aliens convicted of a crime involving moral turpitude shall not apply to one who has been pardoned, nor shall deportation be made or directed if the court, or a judge thereof, sentencing such alien for such crime shall, at the time of imposing judgment or passing sentence or within thirty days thereafter, due notice having first been given to representatives of the state, make a recommendation to the Secretary of Labor that such alien shall not be deported in pursuance of this subchapter.

*United States ex rel. Santarelli v. Hughes,* 116 F.2d 613, 616 n. 15 (3d Cir.1940) (quoting 8 U.S.C.A. § 155). INS at that time was under the direction of the Labor Department. On June 14, 1940, Congress transferred all functions and powers relating to immigration and nationality law to the Department of Justice. Auerbach, at 21. Title 8 U.S.C. § 1251 subsequently replaced section 155 and limited the

respect to a conviction absolutely barred INS from using that conviction as a basis for deportation. *United States v. Bodre,* 948 F.2d 28, 30 (1st Cir.1991). In fact, even appellate courts lacked authority to reverse the district court's grant of JRAD. *Bodre,* 948 F.2d at 34.

On November 29, 1990, the Immigration Act of 1990, section 505(a), however, abolished the sentencing judge's power to issue JRADs. *See* Immigration Act of 1990, Pub.L. No. 101-649, § 505(a). Three years prior to the abolishment of JRADs Congress enacted section 3583(d).[6] The plain meaning of section 3583(d) taken together with the abolishment of JRADs, a longstanding mainstay in the criminal process, not only persuades us that Congress intended to enable district courts to order the deportation of defendants "subject to deportation," but in fact favors such deportation when either the Executive or Judicial Branch deems it appropriate.

In further support of our conclusion, we note that since our holding in *Chukwura* Congress has amended the Immigration and Nationality Act to give district courts the power to order the deportation of alien defendants upon the request of the United States Attorney with concurrence of the Commissioner of INS.[7] *See*

---

application of JRADs to crimes of moral turpitude not involving narcotic offenses. *See* 8 U.S.C. §§ 1251(a)11, (b)(1988).

[6]Section 3583(d) became effective on November 1, 1987.

[7]The district court, however, does not have to grant the government's motion. *See* 8 U.S.C. § 1252a(d)(1) (providing for judicial deportation "if the court chooses to exercise such jurisdiction"). Upon the denial of the United States Attorney's request, the government may appeal the district court's decision as well as seek deportation through INS's administrative proceedings. *See* 8 U.S.C. § 1252a(d)(3), (4).

8 U.S.C. § 1252a(d) (1994). As a result of section 1252a(d), the Executive Branch can now effectuate the deportation of a defendant "subject to deportation" through a judicial rather than an administrative proceeding if the government meets certain procedural requirements. *See* 8 U.S.C. § 1252a(d)(2) (1994).

In response to our holding today, appellants and the government argue that giving effect to the plain meaning of section 3583(d) renders the Immigration and Nationality Act's procedural requirements meaningless, asserting that section 3583(d) authorizes judicial deportation without procedural safeguards. We reject this argument noting that procedural safeguards already exist in the sentencing process through appellate review of the conviction and the sentence. Although we acknowledge that procedural safeguards exist in the sentencing process, we do not contend that these safeguards afford defendants recourse from deportation equal to that available under the Immigration and Nationality Act. This matter, however, is for Congress and not this court to decide. As Justice Frankfurter stated in *Harisiades v. Shaughnessy:*

> The conditions of entry of every alien, the particular classes of aliens that shall be denied entry altogether, basis for determining such classification, the right to terminate hospitality to aliens, the grounds on which such determination shall be based, have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control.

*Harisiades v. Shaughnessy,* 342 U.S. 580, 596-97, 72 S.Ct. 512, 522-23, 96 L.Ed. 586 (1952) (Frankfurter, J., concurring). For this reason, we interpret section 3583(d) in accordance with its plain language and reaffirm *Chukwura* 's holding that section 3583(d) authorizes district courts to deport defendants "subject to

deportation" as a condition of supervised release. In reaching this holding, we emphasize that deportation under this provision is a condition of supervised release and not a sentence. We also note that defendants "subject to deportation" have no constitutional or statutory right to remain in this country. *Shaughnessy,* 342 U.S. at 586-87, 72 S.Ct. at 517. Their "status within the country ... is [merely] a matter of permission and tolerance." *Shaughnessy,* 342 U.S. at 586-87, 72 S.Ct. at 517.

In this appeal, Oboh also argues that the district court failed to give him notice and an opportunity to present evidence or argument that he is not "subject to deportation." [8] At the sentencing hearing, the government presented an INS document revealing that Oboh entered the United States unlawfully. Although, Oboh objected to the introduction of this document because the government did not give him notice of the document prior to the hearing, Oboh did not argue that he legally entered this country. Moreover, Oboh does not argue that the district court erred in finding that he unlawfully entered the United States. We therefore summarily reject Oboh's argument that the district court's order of deportation denied him due process. The plain language of section 3583(d) gave Oboh sufficient notice that the district court could deport him as a condition of supervised release upon a finding that he was "subject to deportation." Accordingly, we affirm the district court's decisions ordering the

---

[8] Bowen does not challenge the fact that he is "subject to deportation" or that he failed to receive adequate notice or an opportunity to be heard as to his eligibility for relief under the Immigration and Nationality Act.

deportation of Oboh and Bowen as conditions of supervised release.

AFFIRMED.

BARKETT, Circuit Judge, dissenting, in which KRAVITCH, ANDERSON, BIRCH and CARNES, Circuit Judges, join:

I believe the majority errs in adhering to *United States v. Chukwura,* 5 F.3d 1420 (11th Cir.1993), *cert. denied,* --- U.S. ----, 115 S.Ct. 102, 130 L.Ed.2d 51 (1994). Like the First, Fourth, and Fifth Circuits, I believe that 18 U.S.C. § 3583(d) provides only that a defendant who is subject to deportation may be surrendered to the INS for deportation proceedings in accordance with the Immigration and Nationality Act ("INA").[1] Because the language of § 3583(d) is subject to different interpretations, we must look to the overall statutory scheme, and prior legislative and judicial history, which I believe support the view that a district court may only surrender a defendant who is subject to deportation to the INS for deportation proceedings, not independently order the deportation.

First, although the majority purports to rely on the "plain language" of § 3583(d) to support its conclusion, the language of the statute is not so plain. It provides, in relevant part:

> If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.

---

[1]As the majority notes, the three other circuits to interpret § 3583(d) have held that the section, read in light of the provisions of the INA, does not authorize judicial deportations, *United States v. Xiang,* 77 F.3d 771, 772 (4th Cir.1996); *United States v. Quaye,* 57 F.3d 447, 449-51 (5th Cir.1995); *United States v. Sanchez,* 923 F.2d 236, 237 (1st Cir.1991).

18 U.S.C. § 3583(d).

Section 3583(d) does *not* state that the court may "order" that the alien be deported; it instead permits the court to "provide" that the alien be deported and remain outside of the United States. That choice of words does not appear to have been inadvertent. The two preceding sentences in § 3583(d) identify things that the court may "order" the defendant to do or not to do as conditions of supervised release, and the final clause of the final sentence states that the court may "order" that the defendant be delivered to a duly authorized immigration official for deportation. In this statutory context, the term "provide" in the portion of the sentence at issue here indicates that it is intended to authorize the court to "make provision" for the alien's deportation, thereby facilitating such action by surrendering the defendant to the INS deportation proceedings, but not to *order* the INS to deport the defendant without the attendant process established by the INA. *See Webster's Third New International Dictionary* 1827 (1986) (defining "provide").

Furthermore, § 3583(d) authorizes the court to provide that the defendant be deported "as a condition of supervised release." That language similarly weighs against *Chukwura* 's interpretation of § 3583(d). By stating that the court may include deportation as a *condition* of supervised release, the language implies that the consequence of a failure to satisfy that condition (where, for example, the INS does not order the defendant deported) is that the court may revoke the defendant's supervised release pursuant to § 3583(e)(3) and require the defendant to serve the period of

supervised release in prison—not that the court may independently order the INS to deport the defendant.[2]  If Congress intended to authorize a court to enter a judicial order of deportation outside the framework of the INA, it more likely would have included such a measure as an independent element of the sentence, rather than as a condition of supervised release, which is limited, of course, to those deportable alien defendants for whom supervised release is ordered at sentencing.

Indeed, the majority fails to consider the purpose of § 3583(d) as a whole, which provides for *supervised* release.  Without a provision such as the last sentence of § 3583(d), "administrative" deportation by the INS might be regarded as inconsistent with *judicially supervised* release, which requires a defendant to *not leave the judicial district without the permission of the court or probation officer.*  The relevant provision, therefore, removes any doubt about the INS's authority to deport the defendant after his period of imprisonment ends and he is placed on supervised release, and is an efficient mechanism by which the court "permits" the defendant to leave the judicial district if the INS orders him to be deported.

Interpreting § 3583(d) as simply facilitating the surrender of defendants subject to deportation to the INS for deportation

---

[2]For example, if the defendant is not ordered deported by the INS—either because he is not found to be deportable, or is granted discretionary relief from deportation—the sentencing court could, in the alternative, modify the order of supervised release to delete the deportation provision. *See generally,* 18 U.S.C. § 3583(e)(2).  Under *Chukwura,* however, the INS has no opportunity to make this determination, or to grant discretionary relief.

proceedings also conforms with the uniform historical practice of Congress conferring the authority to institute deportation proceedings against an alien on Executive Branch officials. Congress has acted pursuant to the constitutional understanding that the "power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Shaughnessy v. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953).

The INA, in 8 U.S.C. § 1252 and implementing regulations, has established the administrative procedures used by the Attorney General in determining whether an alien who is charged with being deportable under 8 U.S.C. § 1251 is, in fact, deportable. Section 1252(b) provides that "the procedure so prescribed shall be the *sole and exclusive procedure* for determining the deportability of an alien under this section," and that "[i]n any case in which an alien is ordered deported from the United States under the provisions of this chapter, or of any other law or treaty, the decision of the *Attorney General* shall be final." (emphasis added). *See also* 8 U.S.C. § 1103(a) ("The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers"); *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 171, 113 S.Ct. 2549, 2559-60, 125 L.Ed.2d 128 (1993).

The reference to deportation in § 3583(d) is contained in a single sentence that does not expressly carve out an exception to the Attorney General's authority over immigration matters, and the legislative history discloses no evidence of congressional intent to do so. It is very unlikely that Congress intended through that single sentence to displace the Attorney General's authority and enforcement discretion in determining whether to institute deportation proceedings against an alien, and, if found deportable, whether to grant the alien discretionary relief.[3] It is also very unlikely that Congress, without saying so, intended § 3583(d) to have the effect of rendering the aliens to whom it applies altogether ineligible for such discretionary relief. As the *Quaye* court noted:

> The First Circuit's interpretation of § 3583(d) also preserves Congress's long tradition of granting the Executive Branch sole power to institute deportation proceedings against aliens. We are unwilling to conclude that Congress intended to undermine that executive prerogative *sub silentio* in § 3583(d), or that Congress intended by its silence to deprive aliens deported at sentencing of such relief as alien asylum, which the Attorney General may grant.

*Quaye,* 57 F.3d at 449-50.

The background of § 3583(d) further reinforces my reading of the statute. The initial predecessor of the current § 3583(d) was enacted in 1931 as an amendment to the former 18 U.S.C. § 716 (1925), which governed the parole of prisoners. The amendment provided that

    where a Federal prisoner is an alien and subject to

---

[3]Even if an alien is deportable, the INA confers on the Attorney General the authority to grant the alien asylum, or other relief from deportation. *See, e.g.,* 8 U.S.C. §§ 1158, 1182(c), 1253(h), 1254(a) and (e).

> deportation the board of parole may authorize the release of such prisoner after he shall have become eligible for parole on condition that he be deported and remain outside of the United States and all places subject to its jurisdiction, and upon such parole becoming effective said prisoner shall be delivered to the duly authorized immigration official for deportation.

Act of March 2, 1931, ch. 371, 46 Stat. 1469.

The committee reports accompanying the 1931 Act explained that because the rules governing parole required that a prisoner remain *within the jurisdiction* of the court, an alien prisoner, who if paroled would be deported, could not be paroled. The legislation was therefore designed to make it possible for prison authorities "to surrender the alien prisoner to immigration officials for deportation" as soon as the prisoner became eligible for parole, "thus shortening the time the Government must retain him in custody." S.Rep. No. 1733, 71st Cong., 3d Sess. 1 (1931) ("Senate Report"); H.R.Rep. No. 1035, 71st Cong., 2d Sess. 1 (1930). The Senate Report reproduced a letter requesting passage of the legislation from Attorney General William D. Mitchell, which stated:

> At the present time there are several hundred inmates serving sentences in Federal prisons who should be deported. Under the present state of the law it has been deemed inconsistent to grant a parole and then immediately take the prisoner into custody under deportation proceedings. Specific authority to parole prisoners who are aliens and subject to deportation seems necessary.

Senate Report at 2. The 1931 Act did not authorize the Parole Board to order the deportation of an alien and supplant the normal deportation procedures. It was intended, rather, to provide a mechanism to grant an alien parole "and then immediately take the prisoner into custody *under deportation proceedings.*" Senate

Report at 2 (emphasis added).  The provision was judicially construed in that manner in *Secchi v. U.S. Bureau of Immigration,* 58 F.Supp. 569 (M.D.Pa.1945), in which the court explained that the alien's parole was "conditional for his deportation to England." *Id.* at 570.  The court explained that parole

> is not for the petitioner's general release from imprisonment and can become effective only if and when the duly authorized immigration officials make the necessary arrangements for the deportation of the petitioner, at which time the prisoner shall be delivered to them....
>
> *The action of the Parole Board cannot compel the Immigration Authorities to complete deportation proceedings.* The parole is granted in order to remove an obstacle in the action contemplated by the Immigration Authorities.  The action of the Parole Board is taken so that if the Immigration Authorities desire to complete the deportation, they may complete it effectively without being compelled to await the completion of the service of petitioner's sentence.

*Id.* (citations omitted) (emphasis added).  The provision was subsequently recodified at 18 U.S.C. § 4204 (1952), *see* Act of June 25, 1948, ch. 645, § 4204, 62 Stat. 854, and later at 18 U.S.C. § 4212 (1976), *see* Parole Commission and Reorganization Act, Pub.L. No. 94-233, § 4212, 90 Stat. 227 (Mar. 15, 1976).

Section 4212 was repealed by the Sentencing Reform Act of 1984, which eliminated the parole system and instituted the system of supervised release, including the current § 3583(d) at issue here.  *See* Pub.L. No. 98-473, Tit. II, ch. 2, §§ 218(a)(5), 235, 98 Stat. 2027, 2031.  Although the committee reports on the Sentencing Reform Act do not specifically discuss the relevant sentence of § 3583(d) concerning deportation of aliens, it is obvious that the sentence was patterned after the former § 4212.[4]  This background

_____

[4]The former 18 U.S.C. § 4212 (1982), as in effect when the Sentencing Reform Act was passed, provided:

suggests that § 3583(d), like its predecessor governing parole, does not authorize a judicial order of deportation, but instead preserves the established procedures under the authority of the INS for effecting the deportation of an alien.

I believe the First, Fourth, and Fifth Circuits' interpretation of § 3583(d) is not only truer to the overall scheme Congress developed to deal with questions concerning immigration law, but also consistent with the case law interpreting other sentencing provisions. District courts historically have lacked the authority to order the deportation of alien defendants who appear before them for criminal sentencing. *United States v. Guevara-Martinez,* 597 F.2d 954, 955 n. 1 (5th Cir.1979) (holding that judiciary lacks authority to order deportation).[5] *E.g., United States v. Olvera,* 954 F.2d 788, 793-94 (2d Cir.1992) (holding that sentencing court cannot order deportation as part of sentence); *United States v. Jalilian,* 896 F.2d 447, 448-49 (10th Cir.1990) (holding illegal deportation as condition of probation pursuant to 18 U.S.C. § 3563); *United States v. Montoya,* 891 F.2d 1273, 1293 n. 24 (7th Cir.1989) (noting in dictum that institution

---

When an alien prisoner subject to deportation becomes eligible for parole, the Commission may authorize the release of such prisoner on condition that such person be deported and remain outside the United States.

Such prisoner when his parole becomes effective, shall be delivered to the duly authorized immigration official for deportation.

[5]Pursuant to *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), decisions of the former Fifth Circuit entered prior to the split establishing the Eleventh Circuit are binding on the Eleventh Circuit.

of deportation proceedings lies within sole discretion of Attorney General); *United States v. Abushaar,* 761 F.2d 954, 959-61 (3d Cir.1985) (holding that 18 U.S.C. § 3651 does not permit banishment of alien defendant as condition of probation); *United States v. Hernandez,* 588 F.2d 346, 350-52 (2d Cir.1978) (declaring condition of deportation illegal as special parole term); *United States v. Castillo-Burgos,* 501 F.2d 217, 219-20 (9th Cir.1974) (holding sentence of deportation to be illegal).

Subsequent congressional action also lends support to the view that § 3583(d) does not authorize district courts to independently order deportations. Since *Chukwura* was decided, Congress amended 8 U.S.C. § 1252a(d) to permit limited "judicial" deportation of aliens convicted of crimes of moral turpitude or aggravated felonies, but only upon the request of the U.S. Attorney and the concurrence of the INS. The 1994 amendment provides that

> [n]otwithstanding any other provision of this chapter, a United States district court shall have jurisdiction to enter a judicial order of deportation at the time of sentencing against an alien whose criminal conviction causes such alien to be deportable under section 1251(a)(2)(A) of this title, *if such an order has been requested by the United States Attorney with the concurrence of the Commissioner [of the INS]* and if the court chooses to exercise such jurisdiction.

8 U.S.C. § 1252a(d)(1) (emphasis added).

As *Quaye* recognized, to read a general power of judicial deportation into § 3583(d), in light of this intervening amendment to § 1252a, would permit district courts to deport some aliens convicted of relatively less serious crimes without affording them any procedural safeguards, with the inapposite result that aliens convicted of particularly heinous crimes would receive the *more* expansive procedural checks available within the auspices of the

Attorney General and INS.[6]  *Quaye,* 57 F.3d at 450;  *see also Xiang,* 77 F.3d at 773 ("The exception that Congress provided for judicial deportation would be meaningless if we could now read § 3583(d) to authorize judicial deportation for lesser crimes without any procedural safeguards.").  "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982);  *In re Chapman,* 116 U.S. 661, 667, 17 S.Ct. 677, 680, 29 L.Ed. 763 (1886) ("nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion").

Accordingly, for the foregoing reasons, I do not believe district courts have the authority to independently order deportation.[7]

---

[6]Ironically, if Bowen were convicted not of illegal reentry into the United States and misdemeanor possession of marijuana, but a more serious offense such as murder, he would have been entitled to the greater procedural safeguards established by § 1252a.  Section 1252a is inapplicable to Oboh's sentencing, however, because it had not yet taken effect at the time Oboh entered his guilty plea.

[7]Because I believe that the district court had no authority to order Oboh deported, I do not address the majority's holding that Oboh received adequate notice as to his deportability.  By not addressing it, I do not mean to imply agreement with the majority's resolution of the issue.