UNITED STATES of America,

v.

**Shahid QADEER a/k/a Shahid Qadeer Bhatti, Defendant.**

**No. CR496–146.**

United States District Court,
S.D. Georgia,
Savannah Division.

Jan. 29, 1997.

### ORDER

MOORE, District Judge.

Currently before this Court is the question of whether it should, pursuant to 18 U.S.C. § 3583(d), deport Defendant Qadeer as a condition of supervised release. For the reasons stated below, this Court will not itself order the deportation of Defendant. However, it will **AMEND** its December 13, 1996, sentencing judgment (Doc. 27) to include the following directive:

> As a condition of supervised release, upon completion of his term of imprisonment, Defendant is to be surrendered to a duly authorized immigration official who will determine whether Defendant should be deported in accordance with the established procedures provided by the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.* As a further condition of supervised release, if he is ordered deported, Defendant shall remain outside the United States in accordance with any directive issued by the Immigration and Naturalization Service.

During the deportation proceedings, Defendant may, with his own resources, obtain the assistance of counsel but he will *not* be entitled to the Government-sponsored assistance of counsel appointed for this criminal case.

### BACKGROUND

On August 14, 1996, the Grand Jury for the Southern District of Georgia returned a True Bill of Indictment against Defendant and his co-Defendant, Ansar Masood Butt (Doc. 1). The one-count Indictment charged that both Defendants worked together in stealing cellular phone air time for the purposes of relaying telephone calls from southeast Georgia to foreign countries including Kuwait, Egypt, and Israel, in violation of 18 U.S.C. § 1029(a)(5). On August 19, Magistrate Judge G.R. Smith appointed counsel for both Defendants pursuant to the Criminal Justice Act of 1964 ("CJA") (Docs. 3 and 4). 18 U.S.C. § 3006A; FED.R.CRIM.P. 44.

As both Defendants were of Pakistani national origin and reportedly had difficulty understanding and communicating in English, Magistrate Judge Smith appointed Dr. R. Khondker, an associate professor of Eco-

Assistant U.S. Attorney Lamar C. Walter, Savannah, GA, for plaintiff.

Roland B. Williams of Hunter, Maclean, Exley & Dunn, Savannah, GA, for defendant.

nomics at Armstrong State College (now Armstrong Atlantic State University), to interpret for both men (Doc. 11). To the Court's satisfaction, Dr. Khondker interpreted several times after his August 20 appointment and was of invaluable assistance to the Court and Defendant.

On October 10, both Defendants pled guilty to the one count in the Indictment (Docs. 20 and 21). In return for the Defendants' guilty pleas, the Government agreed to recommend that the Court employ a two-level reduction for acceptance of responsibility when determining the applicable sentences under the United States Sentencing Guidelines and also agreed to take no position with respect to sentencing. *See* Paragraph One of both Plea Agreements (Docs. 24 and 25).

At the sentencing hearing, this Court sentenced Defendant Butt to twelve months imprisonment and further ordered, that as a condition of supervised release, Defendant Butt would be deported pursuant to 18 U.S.C. § 3583(d) (Doc. 26). With a sentencing range of six to twelve months, the Court sentenced Defendant Qadeer to eight months imprisonment and issued the following statement regarding the conditions of supervised release:

> As an additional condition, defendant might be deported. In early 1997, this Court will hold a hearing pertaining to the question of defendant's deportation at which time this judgment will be amended by the Court to reflect defendant's deportation status. Counsel will be given 30 days notice prior to the aforementioned hearing.

(Doc. 27).

In contrast to Defendant Butt (who undisputedly was an illegal alien), this Court expressed that it had some concerns pertaining

to the question of whether Defendant Qadeer could be deported due to his being in the country under a grant of political asylum from the Immigration and Naturalization Service ("I.N.S."). At the same time, this Court told the Defendants that it was extremely disturbing that they could come to this country seeking its protection and riches and then show their lack of appreciation by choosing to commit crimes for profit almost immediately after their entry into the United States. Both men were ordered to contribute equally to the total amount of restitution which was to be paid to the victim of their crimes: Alltel Communication of Georgia. The aggregate restitution ordered by the Court amounted to $30,631.16.

On December 20, the Clerk of Court issued a Notice to Defendant Qadeer indicating that the deportation hearing would be held on January 23, 1997. The Court conducted the hearing at 2:30 on the afternoon of January 23 and the hearing lasted until approximately 4:15.

### Agent Padilla

At the Court's request, the Government represented the Court's interest and called Agent Pedro Padilla, Jr., of the I.N.S.[1] During his testimony, Agent Padilla reviewed Defendant's I.N.S. file and noted that the I.N.S. had granted him political asylum in 1995. The grant of asylum was contained in a May 10, 1995, letter to Defendant. Specifically, the paragraph pertaining to the grant states: "It has been determined that you have established a well-founded fear of persecution upon return to your homeland. Therefore, in accordance with Section 208(a) of the Immigration and Nationality Act, your request for asylum is granted as of April 27, 1995." Over no objection, the Court admitted the letter as Exhibit 1.

---

1. Defense counsel objected to the Government's direct involvement in the deportation hearing because, according to the plea agreement, the Government had agreed to take no position regarding sentencing. This Court is altogether sure that the Government did not violate any portion of the plea agreement by participating as requested by the Court for two reasons. First, "deportation under [18 U.S.C. § 3583(d)] is a condition of supervised release and not a sentence." *United States v. Oboh*, 92 F.3d 1082, 1087 (11th Cir.1996), *petitions for cert. filed*, 65 U.S.L.W. 2141 (U.S. Nov. 6, 1996) (Nos. 96–6653, 96–6658). Second, the Government only acted as the Court's advocate in presenting one witness and cross-examining the witnesses presented by Defendant. Even if deportation could be considered a portion of the sentence, the Government asserted absolutely no position as to whether Defendant should be deported. It advanced no arguments and made no requests of the Court.

Agent Padilla testified that Defendant had violated a condition of his asylum status by not keeping the I.N.S. informed of changes in address despite being directed to in the May 1995 letter. The portion of the letter addressing this requirement reads: "Finally, you are directed to notify this Service of any change in address within ten days of such change. You may obtain Form AR–11 at your nearest post office or I.N.S. office to comply with this requirement." Agent Padilla stated that the I.N.S. discovered that Defendant had not complied with this request because, when arrested, Defendant gave a Flushing, New York address rather than the Brooklyn, New York address which he had supplied to the I.N.S. The I.N.S. generally considers the failure to notify it of an address change a deportable offense. The Government did not call any witness other than Agent Padilla.

### Dr. Khondker

Defendant called Dr. Khondker, not in his capacity as interpreter but, rather, as an expert witness, to discuss the socio-political situation in Pakistan. As mentioned previously, Dr. Khondker is an economist at Armstrong Atlantic State University; he holds a doctorate of philosophy in that field from West Virginia University. He possesses a notable understanding of the political situation and appears to be an expert on the politico-economic history of the Indian subcontinent. Currently, he is authoring works on the politico-economic histories of that region. It appears that he has remained abreast of the developing situations throughout Pakistan.

Though this Court found Dr. Khondker affable and extremely intelligent, it declined to accept him as an expert witness on any matter other than a politico-economic discussion of Pakistani affairs. It did, however, agree to hear his narrative of the general political history of Pakistan as well as the current political situation in that country. At the same time, the Court indicated that it would not regard that testimony as anything other than observations from a lay observer.

Despite this technical limitation, this Court considers it somewhat valuable to include the discussion of Pakistan's history for purposes of context. Dr. Khondker told the Court that, shortly after India gained its independence from the British Empire, a rift developed between the Hindu majority in the south and the Muslim minority in the north. In two of the northern Indian states, there existed Muslim majorities: in the northeast, Bengal; in the northwest, Punjab. In 1947, after a period of civil war, the eastern portion of Bengal and the western portion of Punjab broke free of Indian rule and formed Pakistan. During this time, a mass exodus of Muslim refugees from India crossed the border into the new country. Dr. Khondker described this relocation as, perhaps, the defining moment in Pakistani history. The western Punjabi territory formed what is now Pakistan proper while the eastern Bengali territory formed what Dr. Khondker referred to as East Pakistan. The two territories, though part of one sovereign entity, were separated by approximately one thousand miles of Indian land.

Dr. Khondker told the Court that the majority of the new Pakistani republic spoke a Bengali language but that the minority in the west spoke a different language and held on to the power structure of the state.[2] The western minority attempted to impose its language as the official language over the entirety of the bifurcated state. This stance, among others, led to increased tensions between the Bengali and Punjabi Pakistanis and the eventual persecution of the Bengalis by the Punjabi minority.

The tension between East Pakistan and Pakistan eventually led to another civil war. In 1971, Bengali Pakistan, with the aid of the Indian military, defeated the Pakistani forces, divorced itself from Pakistan, and formed what is now Bangladesh. Dr. Khondker is a Bengali Pakistani; he left the Indian subcontinent in September 1977 and came to the United States. Defendant, apparently, is also a Bengali Pakistani who lived in Karachi in Pakistan proper until he left for North America.

---

2. The Court can only assume that it is the Punja- bi language to which Dr. Khondker referred.

Despite the formal schism of the old Pakistan, many ethnic Bengalis remain in Pakistan but now constitute an ethnic minority in that state due to most Bengalis living in the separate state of Bangladesh. The majority party is the Pakistan People's Party ("PPP") which is inextricably intertwined with the security apparatus of the Pakistani state. Dr. Khondker commented that the PPP rarely follows the laws designed to curtail government abuses and has instituted a nearly perpetual system of martial law. Meanwhile, as something of an opposition group, there formed a political party comprised of Bengali Pakistanis and others. This opposition group, alluding to the 1947 exodus, calls itself the Mohajir Quami Movement ("MQM"), or the National Refugee Movement. The MQM is the third largest political party in Pakistan. *See* Sanjay Suri, *MQM Announces Candidates but May Boycott Elections*, INDIA ABROAD, January 17, 1997, at 1. Dr. Khondker estimates that there are 20,000,000 supporters of MQM but only 200,000 active partisans in Pakistan.

According to Dr. Khondker, the PPP security forces often subject MQM partisans to severe repression and retaliation for their political activity. The PPP has created a "very political army" which has acted particularly egregiously in the last three years. The political climate was extremely volatile in 1994 when the actions of the security forces propelled Pakistan onto Amnesty International's Top Ten list of Human Rights Violators. As a result, the leader of MQM, Altaf Hussain, has removed himself from Pakistan and now lives in self-imposed exile in London.

Dr. Khondker also tendered portions of three newspapers to the Court which demonstrate that the Pakistani political situation is still very disturbed and that the MQM remains a much-harassed political party. *See* Anonymous Correspondent, *MQM Condemns Non–Production of Detenus* (Detainees), THE INTERNATIONAL NEWS, Karachi ed., September 21, 1996, at 2 (discussing how the government was detaining MQM party leaders for months without producing them in courts); *see also* Anonymous Correspondent, *Police Become Symbol of Terrorism: Haqiqi*, THE INTERNATIONAL NEWS, Karachi ed., September 21, 1996, at 2 (reporting MQM allegations that police were using "fake encounters" to kill MQM political leaders and partisans); *see also* Sanjay Suri, *MQM Announces Candidates but May Boycott Elections*, INDIA ABROAD, January 17, 1997, at 1 (reporting MQM allegations that police had raided and ransacked Karachi MQM election office, burned the party's flags, shot at MQM party workers, and tortured MQM office workers); *see also* Kalim Bahadur, *Clear Verdict Likely in Pakistan's Election*, INDIA ABROAD, January 10, 1997, at 2, 10 (discussing outside reports which substantiate MQM claims of political violence). As a result of his understanding of Defendant Qadeer's MQM participation (which was gleaned from the uncorroborated narratives of Defendant), Dr. Khondker concluded that it was almost certain that Defendant would be persecuted upon his return to Pakistan and that, quite possibly, he would be killed by the Pakistani security forces. At this point in his testimony, it appeared to the Court that Dr. Khondker had gone beyond his roles as lay observer and interpreter and assumed the position of Defendant's advocate.

*Defendant Qadeer*

Defendant then testified on his own behalf. First discussing the address incident mentioned by Agent Padilla, Defendant claimed that his wife lived at the Flushing address but that he still retained the Brooklyn address and, therefore, had no actual change of address to report to the I.N.S.[3]

Defendant then discussed his involvement with the MQM. He claimed that he was a very active MQM partisan in Karachi, the largest city in Pakistan, and that he eventually assumed the office of the Joint Secretary of the Karachi division. He discussed how, in a 1991 incident, PPP security forces attempted to kill him by hitting him with a car while he was riding a motorcycle. He stated that this was part of a plan to kill him and a few other MQM members in the Karachi division. He was arrested in early 1994 by

---

3. In its analysis of the deportability of Defendant, *infra,* the Court declines to discuss whether the address change incident renders Defendant deportable.

the security forces and held and tortured for nine days without the filing of any charge against him.[4] The police subsequently released Defendant.

Defendant stated that the security forces again arrested him in July 1994 and held him for seventeen days during which they beat him so severely that he had to recuperate for a period of one week subsequent to his release. His father secured his release by posting bail for him. After bail was posted, his father advised him to leave the country because the security forces had told his father that Defendant would not be released again. Defendant stated that he took his father's advice and left Pakistan. Currently, a warrant is pending for his arrest due to his having "jumped bail" and left the country. He claimed that several of his MQM friends who did not leave the country have been killed by the PPP security forces.

Defendant testified that he left Pakistan through the assistance of an "agent" who arranged his illegal entry into Canada. Whether this "agent" is a travel agent or a alien smuggler was not clear to the Court but it appears as if the latter description is more correct. While in Canada, someone informed him that he had a better chance of being granted political asylum in the United States. Two days after his illegal entry into Canada, he made his way to the United States and entered this country as an illegal alien. After approximately three months, he went to the I.N.S. and applied for political asylum. He claimed that he presented documentation of his MQM activity to the I.N.S. and that, based upon those documents and upon his averments pertaining to his past persecution, they granted his application for political asylum.[5]

Shortly thereafter, his wife came into the United States, also through an "agent", as did his mother, who came here on a visitor's visa. This visa expired several months ago but his mother remains in the country; presumably, she is now an illegal alien. After these facts were brought out at the hearing, this Court left with the impression that, as far as his family was concerned, Defendant had little respect for this country's laws or immigration policies and had acted to seize every possible advantage for himself with little regard for the procedures established by federal law.

With the background now fully laid out, this Court turns to the determination of the deportation question.

## ANALYSIS

### I. *The Judicial Power of Deportation.*

When Defendant Qadeer and Defendant Butt pled guilty to the charges contained in the Indictment, this Court began looking into whether it could order the deportation of those two men. The language of the relevant statute governing conditions of supervised release clearly gives district courts the power to deport certain aliens: "If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation." 18 U.S.C. § 3583(d). Despite this seemingly clear language, however, most circuits which have considered the provision have ruled that the Executive possesses the sole power of deportation and, therefore, district courts do not have the intrinsic power to order deportation and consequently cannot order that a defendant alien be deported as a condition of supervised release.

*The Majority View*

In *United States v. Phommachanh*, 91 F.3d 1383, 1384 (10th Cir.1996), a Tenth Cir-

---

**4.** Dr. Khondker interjected that the Pakistani government is supposed to operate under a provision, held over from the days of the Imperial Code, which mandates that a person can be held no longer than seven days without charges being filed against him.

**5.** The Court observes that these are simply allegations from Defendant which are not supported by any independent proof. When the Government stated that it could find no hard documentation in Defendant's I.N.S. file, counsel for Defendant argued that the absence did not mean that it had not been presented to I.N.S. because, after all, the I.N.S. had concluded that Defendant had established a well-founded fear of persecution.

cuit panel considered the case of a permanent resident alien who had pled guilty to two counts of using or carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). One paragraph in the plea agreement read: " 'I have been advised and understand that ... a conviction of a criminal offense may result in deportation from the United States.' " *Id.* The United States Probation Office advised the defendant that he might be deported while, at the sentencing hearing, the Government requested that the district court order the defendant to be surrendered to the Immigration and Naturalization Service for an administrative (as opposed to judicial) deportation determination. *Id.* The district court decided that it held the power to order the deportation of the defendant; the court ordered him deported, commenting that he " 'doesn't deserve to be in the United States under any circumstances at any time ever.' " *Id.*

The defendant appealed, arguing that the district court lacked the power to directly order his deportation. *Id.* The Tenth Circuit panel agreed with the defendant and amended the district court's judgment by vacating the deportation order and, instead, ordering the defendant to submit to an I.N.S. deportation hearing. *Id.* at 1385, 1388. In so ruling, the appellate court reasoned that 18 U.S.C. § 3583(d) was ambiguous and the statutory ambiguity had to be resolved in the alien's favor. *Id.* at 1385.

Specifically, the *Phommachanh* court questioned the words in § 3583(d). The court found that there existed doubt as to whether the statute actually conferred the direct deportation power upon district courts:

> By using two different verbs to describe what a district court may do under § 3583(d), Congress presumably intended the verbs to convey their respective meanings. Section 3583(d) states that "the court may provide, as a condition of supervised release, that [an alien subject to deportation] be deported," but that it "may order that [the alien] be delivered to a duly authorized immigration official for such deportation." ... Had Congress intended that § 3583(d) allow the sentencing court

to order or "authoritatively direct," deportation, it could have easily so stated. However, its choice of the verb "provide" connotes a different, presumably intended meaning; it allows the sentencing court "[t]o exercise foresight ... in view of a possible event," see 12 THE OXFORD ENGLISH DICTIONARY 71 (2d ed. 1989), by directing that in the event that the INS determines that the defendant-alien is "subject to deportation" upon release from prison then the defendant-alien is to be deported.

*Id.* at 1385–86 (statutory and case citations omitted). The court concluded that the statute only authorized district courts to order the defendant to be subjected to I.N.S. deportation hearings. *Id.* at 1386. In addition to the question of statutory interpretation, the *Phommachanh* court concluded that to allow judges to directly order deportation would constitute an impermissible diffusion of the line between the Judicial and Executive branches of government. *Id.* at 1386–87.

The Fifth Circuit in *United States v. Quaye*, 57 F.3d 447 (5th Cir.1995) also found that judicial deportation through 18 U.S.C. § 3583(d) constitutes a violation of the separation of powers doctrine. The *Quaye* court opined that disallowing judicial deportation

> preserves Congress's long tradition of granting the Executive Branch sole power to institute deportation proceedings against aliens. We are unwilling to conclude that Congress intended to undermine the executive prerogative *sub silentio* in § 3583(d), or that Congress intended by its silence to deprive aliens deported at sentencing of such relief as alien asylum, which the Attorney General may grant.

*Id.* at 449–50. The court vacated that portion of the sentence which ordered the defendant's deportation and remanded the case with instructions that the district judge amend the sentence to require defendant to be surrendered to the I.N.S. for the deportation determination. *Id.* at 451.

The First, Second, and Fourth Circuits have also held that 18 U.S.C. § 3583(d) does not vest the federal judiciary with the power to deport alien-defendants. *United States v. Sanchez*, 923 F.2d 236, 237 (1st Cir.1991);

*United States v. Kassar*, 47 F.3d 562, 568 (2nd Cir.1995); *United States v. Xiang*, 77 F.3d 771, 772 (4th Cir.1996).

### The Eleventh Circuit View

The Eleventh Circuit, however, is the one maverick court which has unequivocally stated that district courts may order the deportation of alien-defendants as a condition of supervised release. In *United States v. Chukwura*, 5 F.3d 1420, 1423–24 (11th Cir. 1993), *reh'g and reh'g en banc denied*, 14 F.3d 60 (11th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 51 (1994), an Eleventh Circuit panel departed dramatically from the analyses which were and would be followed by the other circuits considering the powers vested in courts by the deportation provision of 18 U.S.C. § 3583(d).

After the resident alien in *Chukwura* pled guilty to one count of 18 U.S.C. § 1344 bank fraud and one count of 42 U.S.C. § 408(g) fraudulent use of a social security number, Judge J. Owen Forrester of the Northern District of Georgia sentenced him to twenty-one months of imprisonment and three years of supervised release. *Id.* at 1422. "As a condition of his supervised release, the district court ordered Chukwura deported, stating that he must 'depart the United States and reside beyond its borders for three years,' 'with all deliberate speed.' " [6] *Id.* The defendant appealed the deportation condition of his supervised release, arguing that Congress did not give the judiciary the power to deport aliens and, even if it did confer such power, that the grant of power violated the separation of powers doctrine. *Id.* at 1423–24.

The *Chukwura* court disagreed with the defendant and affirmed the deportation condition. *Id.* Looking first at the statutory language issue, Judge Hatchett [7] did not buy into the statutory ambiguity arguments asserted by the aliens-defendant in the cases discussed above:

> Section 3583(d) plainly states that if a defendant is subject to deportation, a court may order a defendant deported "as a condition of supervised release." The statute then provides that if the court decides to order the defendant's deportation, it then "may order" the defendant delivered to a "duly authorized immigration official" for deportation.... The language is unequivocal and authorizes district courts to order deportation as a condition of supervised release, any time a defendant is subject to deportation.

*Id.* at 1423. The *Chukwura* court applied a plain-meaning approach to the statute and interpreted the statute as allowing district courts to order a resident alien deported while leaving the mechanics of the deportation to the I.N.S. *Id.*

Unlike the other circuits, the Eleventh Circuit did not read the last line of § 3583(d) as creating an ambiguity. *Id.* Judge Hatchett wrote that the last line's allusion to the I.N.S. referral does not undermine the judge's power but only states the obvious: i.e., that the I.N.S. retains the ministerial duties and powers of actually setting in motion the logistics of deportation (travel, out-processing, etc.) as opposed to the deportation determination itself. *Id.*

The opinion only briefly touched upon the separation of powers argument but did not actually perform any sort of constitutional or historical analysis. *Id.* at 1423–24. Rather,

> In the opinion of this Court, the 2nd Circuit did future deportable aliens no favor as, to ensure that other courts read their intentions correctly, the district courts of the Eleventh Circuit likely will not continue to order limited periods of deportation and will instead issue "general" orders of deportation, as 18 U.S.C. § 3583(d) clearly allows.

---

**6.** Mr. Chukwura was escorted out of the United States on November 4, 1994, but was arrested on August 13, 1995, when he attempted to reenter through New York City's Kennedy Airport. *See United States v. Chukwura*, 101 F.3d 230, 231 (2d Cir.1996). Subsequently, he was convicted of entering the United States after deportation without permission of the Attorney General in violation of 8 U.S.C. § 1326. *Id.* at 230. Quizzically, the Second Circuit, which follows the no-judicial-deportation school of thought, ruled that he could not be convicted under that statute because Judge Forrester's order excluded the defendant for a limited period of three years and, therefore, was *not* a general deportation order. *Id.* at 232.

**7.** In 1996, subsequent to the drafting of this opinion, Judge Hatchett became the Chief Judge of the United States Court of Appeals for the Eleventh Circuit.

the court simply stated that "the statute does not infringe upon the I.N.S.'s authority to deport resident aliens." *Id.* at 1423. In essence, the court stated that, because the I.N.S. could still deport any alien it determined should be deported, the grant of power to the judiciary worked in concert with (instead of against) the deportation powers vested in the I.N.S.: "Because we must assume that Congress is aware of existing laws when it passes legislation, we construe the court's authority under section 3583(d) to coexist with the I.N.S.'s deportation authority. *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 325–26, 112 L.Ed.2d 275 (1990). Thus, while both may order defendants deported, only the I.N.S. may actually deport them." *Id.* at 1423–24. The two other judges on the panel, Judge Fay and Senior Judge Johnson, joined in Judge Hatchett's opinion. *Id.* at 1422.

In 1995, another Eleventh Circuit panel, this one composed of Judge Birch, Judge Barkett, and Senior Judge Henderson, called into question the *Chukwura* decision. *United States v. Oboh,* 65 F.3d 900 (11th Cir. 1995), *reh'g en banc granted, decision vacated,* 70 F.3d 87 (11th Cir.1995). In the *Oboh* decision, Judge Barkett, writing for the panel, roundly criticized and expressed deep concerns over the implication of the *Chukwura* decision. *Id.* at 902. Though she was chomping at the bit to discard the earlier opinion, Judge Barkett wrote: "Nonetheless, we are bound by precedent. Because this Court in *Chukwura* found that a district court has the authority to order deportation, only the court sitting en banc may hold otherwise." *Id.* After reading the *Oboh* opinion and considering its tenor, this Court believes that the panel was simply setting up the *Chukwura* decision, hoping it would be spiked by the full Eleventh Circuit. But the *Chukwura* decision was not spiked. *See United States v. Oboh,* 92 F.3d 1082 (11th Cir.1996) ("*Oboh II*"), *petitions for cert. filed,* 65 U.S.L.W. 2141 (U.S. Nov. 6, 1996) (Nos. 96–6653, 96–6658).

In *Oboh II,* the *en banc* Eleventh Circuit, in a seven to five decision, refused to strike down the judicial deportation provision of 18 U.S.C. § 3583(d) and confirmed the validity of the *Chukwura* decision. *Id.* at 1083. Judge Hatchett, the author of the *Chukwura* opinion, wrote the majority opinion in which Chief Judge Tjoflat, Judge Edmondson, Judge Cox, Judge Dubina, Judge Black and Senior Judge Henderson joined. Judge Barkett, the author of the earlier *Oboh* opinion, meanwhile, wrote the dissenting opinion in which Judge Kravitch, Judge Anderson, Judge Birch, and Judge Carnes joined.

The *Oboh II* court agreed with and expanded upon the *Chukwura* decision. Looking at the judicial deportation provision of 18 U.S.C. § 3583(d), the Eleventh Circuit found that the language was "clear and unequivocal" in giving the power of deportation to federal judges. *Id.* at 1084. Judge Hatchett wrote:

> The language states that a sentencing court may require that a defendant "subject to deportation" be deported as a condition of supervised release and order the surrender of the defendant to I.N.S. for such deportation. This court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254, 112 S.Ct. at 1149 (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981)).

*Id.*

Finding that the statute explicitly authorized judicial deportations, the *Oboh II* court then turned to the question of whether that legislative authorization violated the separation of powers doctrine. *Id.* at 1085. Judge Hatchett dismissed the separation of powers argument in an off-hand manner, noting that "Article I, Section 8, Clause 4 of the Constitution grants Congress exclusive authority to formulate the United States immigration policy." *Id.* at 1086 n. 4. He also conceded that, for almost the entire history of the Republic, Congress had given the power to the Executive Branch: "From 1798 to the enactment of section 3583(d) in 1987, the

Executive Branch retained exclusive authority to order the deportation of aliens." *Id.*

Unlike the *Chukwura* court, the *Oboh II* court did consider the argument that, in itself, the history of the Executive Branch's monopoly over deportation matters eviscerated the notion that Congress actually could have intended to give an ounce of this traditionally Executive power to the federal courts. *Id.* at 1087. The Eleventh Circuit considered the history of the allocation of deportation powers, as did the First Circuit in *Sanchez*, the Fourth Circuit in *Xiang*, and the Fifth Circuit in *Quaye*. *Id.* at 1084–86. The court commented:

> Like other courts that have addressed this issue, we believe it is instructive to look at the allocation of power between the Executive and Judicial Branches with respect to deportation in determining whether Congress intended to grant courts authority to deport when it enacted 3583(d). The First, Fourth, and Fifth Circuits' analysis, however, fails to recognize important congressional action that occurred before and after the enactment of section 3583(d). As previously noted, the Executive Branch, prior to the enactment of section 3583(d), had exclusive authority to order the deportation of a convicted alien "subject to deportation." The Executive Branch's authority, however, was not unlimited. The Judicial Branch, for over seventy-five years, possessed the power to thwart I.N.S.'s ability to deport.... Under [certain] circumstances, a district court could issue a judicial recommendation against deportation (JRAD) to I.N.S. to prevent I.N.S. from finding an alien deportable or excludable on the basis of that conviction. A JRAD[,] once properly entered with respect to a conviction[,] absolutely barred I.N.S. from using that conviction as a basis for deportation.

*Id.* at 1086 (citation omitted).

Judge Hatchett described how, three years subsequent to the enactment of 18 U.S.C. § 3583(d), Congress abolished the JRAD practice. *Id.* at 1087. He concluded that this abolition, together with the enactment of the judicial deportation provision, demonstrated the congressional policy "favor[ing] deportation when either the Executive or Judicial Branch deems it appropriate." *Id.* at 1087. With that understanding, the *Oboh II* court left standing the *Chukwura* holding and found that Congress had indeed authorized federal judges to deport convicted aliens. *Id.* The court also commented "that defendants 'subject to deportation' have no constitutional right to remain in this country. Their 'status within the country ... is [merely] a matter of permission and tolerance.' " *Id.* (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 586–87, 72 S.Ct. 512, 517–18, 96 L.Ed. 586 (1952)).

As noted in the initial citation of *Oboh II*, the two defendants have applied for writs of certiorari. This Court feels that it is likely that the Supreme Court will issue writs to the Eleventh Circuit, due to the question involved and the pronounced split among the several circuits. Currently, however, this Court finds itself in one of the nine districts which clearly have the power to order the deportation of convicted aliens as a condition of supervised release. This Court now addresses whether it will exercise that power and order the deportation of Defendant Qadeer.

## II. *The Deportability Question*

The language of 18 U.S.C. § 3583(d) permits a district court to order the deportation of a convicted alien *if* that alien is "subject to deportation." From the outset, this Court has been concerned that Defendant Qadeer might not be subject to deportation and, therefore, the Court could not order him deported as a condition of his supervised release. This Court suspected that, by the nature of his conviction, Defendant Qadeer was a deportable alien. Upon reference to the pertinent statute, however, there was some confusion as this Court looked to 8 U.S.C. § 1251 defining "Deportable aliens". Looking at the current printed edition of the statute, this Court found only one provision applicable:

> Any alien who—
>
> (I) is convicted of a crime involving moral turpitude committed within five years ... after the date of entry, and

(II) either is sentenced to confinement or is confined therefor in a prison or correctional institution for one year or longer, is deportable.

8 U.S.C. § 1251(a)(2)(A)(i). Because this Court had sentenced Defendant Qadeer to only eight months imprisonment, it appeared that he could not be defined as deportable due to the twelve months imprisonment requirement in subsection (II).

### The Amendment to 8 U.S.C. § 1251(a)(2)(A)(i)

■ I.N.S. Agent Padilla, however, asserted that Defendant Qadeer's crime rendered him deportable under the statute as recently amended. Defense counsel objected, stating that the amended statute was not yet effective. This Court stated that it would review the statute and determine the effective date.

Upon review, this Court has determined that Defense counsel's argument that this new statute is not yet effective is without merit. Congress has provided that the amended provision "shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act [Apr. 24, 1996]." Pub.L. 104–132, § 435(b). Clearly, the new provision is effective insofar as Defendant Qadeer is concerned.

■ Under the amended § 1251(a)(2)(A)(i), Defendant Qadeer's conviction can be defined as a deportable offense. Subsection (II) has been amended to remove the reference to term of imprisonment and has replaced it with the following language: "is convicted of a crime for which a sentence of one year or longer *may be imposed*." Pub.L. No. 104–132, § 435(a) (emphasis added). Therefore, district courts need no longer concern themselves with the term of imprisonment which *has* been imposed but need only look to the maximum term of imprisonment which *may* be imposed under the relevant statute and sentencing guidelines. In this case, with a Total Offense Level of Ten and a Criminal History Category I, the United States Sentencing Guidelines set Defendant's imprisonment range at six to twelve months. *See* United States Sentencing Commission, *Guidelines Manual*, Sentencing Table (Nov.1995). Because Defendant Qadeer could have been sentenced to a one year term of imprisonment, subsection (II) is satisfied.

### Moral Turpitude

■ Turning to the crime of "moral turpitude" requirement of subsection (I), this Court need not engage in a lengthy discussion pertaining to whether the crime is one of moral turpitude due to the simple fact that Defendant was convicted of a crime involving fraud. *See* 18 U.S.C. § 1029 (statute named "Fraud and related activity in connection with access devices"). "[F]raud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude." *Jordan v. DeGeorge,* 341 U.S. 223, 229, 71 S.Ct. 703, 706, 95 L.Ed. 886 (1951); *see also United States v. Bailey,* 41 F.3d 413, 418 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2563, 132 L.Ed.2d 815 (1995) (holding that defendant's use of falsified electronic serial numbers for cellular phones allowed fraudulent access to benefits of account between local and long distance carriers and therefore violated 18 U.S.C. § 1029). The basis of the charges levied against Defendant Qadeer, to which he pled guilty and allocuted, "constitutes an attempt to defraud the cellular carrier, and intent to defraud is an element, along with the involvement of an 'access device,' of any violation of 18 U.S.C. § 1029." *Bailey,* 41 F.3d at 418.

"Whether a crime involves moral turpitude depends upon the inherent nature of the crime, as defined in the statute concerned, rather than the circumstances surrounding the particular transgression." *Okabe v. I.N.S.,* 671 F.2d 863, 865 (5th Cir.1982) (citing *Forbes v. Brownell,* 149 F.Supp. 848, 849 (D.D.C.1957)). Therefore, when reaching the "moral turpitude" determination, the district court looks only to the defining characteristic of the statute and whether the defendant has been convicted of the statutory offense. *Id.*

In this case, the subject crime, 18 U.S.C. § 1029, involves an element of fraud; Defendant Qadeer has been convicted under that

statute. He has committed a crime of moral turpitude. Under 8 U.S.C. § 1251(a)(2)(A)(i), Defendant is defined as a deportable alien.

### III. *The Hornet's Nest to Avoid*

■ As Defendant has been defined as deportable, this Court should be able to go ahead and order the deportation of Defendant Qadeer. This Court, however, is concerned with his status as a political asylee and is further concerned that, should it order Defendant deported, it might be setting up a conflict of powers between it and the Executive Branch. Such an order might also implicate international obligations.

Of particular concern to this Court is one provision of the Immigration and Nationality Act which mandates the Attorney General to withhold the deportation of certain aliens:

> The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1253(h)(1) (as amended 1980). While 8 U.S.C. § 1253(h)(2) incorporates some exceptions to that rule (for example, if the alien is a threat to the security of the United States or has engaged in persecution of others on account of race, etc.), this Court does not see that any of those exceptions apply here. Section 1253(h) worries this Court because, if it should order Defendant deported, then it might be effectively setting up a conflict between the powers of the Executive Branch and the powers of the Judiciary.

### *The Duties of the Attorney General*

Currently, there are two methods which an otherwise deportable alien who claims that he will be persecuted if deported can seek relief. The first provision is a provision which *requires* the Executive to engage in affirmative acts of protection; as set forth in the preceding paragraph, 8 U.S.C. § 1253(h) *mandates* the Attorney General to withhold deportation of an alien if that alien demonstrates that his "life or freedom would be threatened" due to such things as his ethnicity or political beliefs. The second provision, meanwhile, vests the Executive with the *discretionary* power to prevent the deportation of an otherwise deportable alien. 8 U.S.C. § 1158(a), as supplemented by 8 U.S.C. § 1101(a)(42)(A), gives the Attorney General the *discretion* to grant asylum to an alien who is unable or unwilling to return to his homeland "because of persecution or a well-founded fear of persecution" arising out of such factors as his ethnicity or political beliefs.

This Court believes it is worth briefly discussing the recent history of 8 U.S.C. § 1253(h) (also referred to as § 243(h) of the Immigration and Nationality Act) in order to fully flesh out its concerns in this case.

From the passage of the comprehensive Immigration and Nationality Act in 1952 until 1968, the Attorney General was authorized to "withhold deportation of an otherwise deportable alien if the alien would be subject to persecution upon deportation." *I.N.S. v. Stevic,* 467 U.S. 407, 414, 104 S.Ct. 2489, 2493, 81 L.Ed.2d 321 (1984). During this period, the alien had to show that there existed a " 'clear probability of persecution' or a 'likelihood of persecution' " in order to be eligible for the protections of the deportation withholding provision. *Id.* (citations omitted). The statutory language at the time did not mandate action on the part of the Attorney General; rather, it simply vested him with the discretion to withhold the deportation if the probability of persecution had been demonstrated. *Id.*

In 1968, the United States became a signatory to the United Nations Protocol Relating to the Status of Refugees.[8] As a result of the Protocol, the United States Government essentially agreed to enact implementing legislation guaranteeing that no refugee would

---

8. Article 1.2 of the Protocol defines a "refugee" as an individual who "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, unwilling to avail himself of the protection of that country." 19 U.S.T. 6223 (1968).

be returned to a country where he would be persecuted because of his beliefs, race, etc., unless that individual was a threat to national security or public order. *Id.* at 416, 104 S.Ct. at 2494 (citing 19 U.S.T. 6223, 6275–76 (1968)). Although the Protocol apparently mandated the United States Government to act in a certain fashion, the withholding of deportation provision in the United States Code was not amended to reflect that mandatory nature. *Id.* at 417, 104 S.Ct. at 2494. "It was ... believed that apparent differences between the Protocol and existing statutory law could be reconciled by the Attorney General in administration and did not require any modification of statutory language." *Id.* at 417–18, 104 S.Ct. at 2494–95.

In 1980, responding to increased international concerns, Congress finally amended 8 U.S.C. § 1253(h) to reflect the mandatory nature of the Protocol provisions. The amended statute is currently the one which the Court must consider. Despite the fundamental shift from discretionary to mandatory application, there was no attempt to adequately define exactly when the protection of the statute was implicated. "In short, the text of the statute simply does not specify how great a possibility of persecution must exist to qualify the alien for the withholding of deportation." *Id.* at 421–22, 104 S.Ct. at 2496.

In the *Stevic* decision, the alien argued that the mandatory application should be implicated if the applicant could demonstrate a " 'well-founded fear of persecution' " under the statutory definition of "refugee" (found at 8 U.S.C. § 1101(a)(42)(A)). *Id.* at 423, 104 S.Ct. at 2497. The Supreme Court disagreed with the alien, commenting that § 1101(a)(42)(A) was not referred to in § 1253(h) and that the term "refugee" applied to grants of asylum, which are discretionary, as opposed to withholdings of deportation, which are mandatory. *Id.* at 429–30, 104 S.Ct. at 2501. Because of the subjective nature of the "well-founded fear of persecution" standard, the Court found it too generous to implicate the mandatory protections of the United Nations Protocol. *Id.* at 425, 104 S.Ct. at 2498–99. The Court refused, however, to spell out what the governing standard should be: "We have deliberately avoided any attempt to state the governing standard beyond noting that it requires that an application be supported by evidence that it is more likely than not that the alien would be subject to persecution on one of the specified grounds." *Id.* at 429–30, 104 S.Ct. at 2501. The Court went so far to determine, however, that the standard was closer to a " 'clear probability of persecution' " than a " 'well-founded fear of persecution' ".

The issue was revisited in *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987), in which the Supreme Court reiterated that the "well-founded fear of persecution" test for asylum status was more generous than the test for the withholding of deportation, owing in large part to the fact that the former is a form of discretionary protection while the latter is a form of mandatory protection. In so ruling, the *Cardoza–Fonseca* Court explicitly protected aliens applying for asylum status from the more rigorous standard associated with the withholding of deportation.

The Eleventh Circuit has recently crystallized the impact which the *Stevic* and *Cardoza–Fonseca* decisions have had:

> An applicant for asylum must establish that he is (1) a "refugee" by showing either past persecution or a well-founded fear of persecution, and (2) entitled to asylum as a matter of discretion. An applicant for withholding of deportation must show a "clear probability of persecution," or that he will more likely than not be persecuted if deported. If an applicant is unable to meet the "well-founded fear" standard for asylum, he is generally precluded from qualifying for either asylum or withholding of deportation.

*Nkacoang v. I.N.S.*, 83 F.3d 353, 355 (11th Cir.1996) (footnotes and statutory citations omitted).

In this case, Defendant Qadeer has already been granted asylum by the I.N.S. Furthermore, were this Court the body considering the grant of asylum to Defendant, it likely would find that Defendant was *eligible* for, as opposed to entitled to, the protections of political asylum.

To be quite frank, what concerns this Court is that, even if it should order Defendant deported, Defendant would still be entitled to apply for the mandatory protections of 8 U.S.C. § 1253(h). While that statute strictly applies to the Executive Branch and not the judiciary, one can see how a clash between the Attorney General and the Judiciary could arise should a court order the deportation of an alien who, as it turns out, is entitled to the mandatory withholding of deportation protection. The Attorney General, as required by domestic and international law, would simply have to step in and overturn a judicial order of deportation. This is simply not the way the checks and balances of the United States Constitution are supposed to operate. American history teaches us that, when the Redcoat General Cornwallis surrendered to the American Revolutionary General Washington, the British military band played a popular tune of the times entitled "The World Turned Upside Down". That apocryphal tune comes to mind as one considers that, in essence, the Executive would be reviewing decisions of the Judiciary in clear contravention of the plans of the Framers of the Constitution.

Therefore, this Court will not venture forth and kick the hornet's nest blithely. Despite clearly having the power to order the deportation of Defendant Qadeer, this Court believes that, when a situation presents a deportable Defendant who is here on a grant of political asylum, it is advisable and, perhaps, in the scheme of things, required that the decision of deportation be left in the hands of the Executive. Accordingly, upon the termination of his imprisonment, Defendant Qadeer will be surrendered to the I.N.S. who will then immediately conduct hearings, in accordance with its own internal regulations, to determine whether it should deport Defendant.[9] With this referral, this Court issues the non-binding recommendation that the INS deport Defendant.

 Defendant will not be entitled to CJA-subsidized assistance of counsel during the I.N.S. proceedings.[10] "While an alien has the statutory right to counsel at his own expense pursuant to 8 U.S.C. § 1252(b)(4),[11] there is no Sixth Amendment right to appointed counsel at a deportation hearing." *United States v. Torres–Sanchez*, 68 F.3d 227, 230 (8th Cir.1995); *see also I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). Therefore, counsel for Defendant will not be required, under the CJA, to engage in any efforts relating to Defendant's I.N.S. proceedings.

## IV. *Conclusion*

In conclusion, this Court believes that it is worth mentioning that it still *strongly believes* that Defendant should be deported. While it will leave determinations of fact and credibility to the I.N.S., it finds it illogical that Defendant, who claims to have been subjected to barbaric treatment in Pakistan, came to this country, and benefitted greatly from its protections, would risk returning to the hands of his oppressors through simple acts of larceny. According to Defendant, this country gave him refuge from the abuses of a despotic regime while granting him permission to live and work in what has been referred to as The Shining City on a Hill. And how did Defendant express his gratitude to the Government and people who, under law, had no duty to extend him or his family the protections he sought?

He became a common thief.

This fact is all the more disturbing in that the Record reveals that Defendant did not engage in the subject thievery because he lived in squalid conditions or abject poverty.

9. Even if this Court lacked the special deportation powers conferred upon district judges in the Eleventh Circuit, it would still possess the power to order a defendant referred to I.N.S. deportation proceedings as a condition of supervised release. *See United States v. Ruiz–Castro*, 92 F.3d 1519, 1535 (10th Cir.1996).

10. Magistrate Judge Smith appointed Attorney Roland Williams of Savannah, Georgia, to serve as counsel for Defendant. Attorney Williams performed his duties to his client and the Court with remarkable zeal and professionalism.

11. The I.N.S. regulations require the Immigration Law Judge to inform aliens of this statutory right to obtain counsel and to give them a list of free legal service organizations. 8 C.F.R. § 242.16(a) (1995).

Defendant had a job which provided him with a steady pay check. He apparently became a thief for profit and not out of any pressing need to put food on his family's table. Quite simply, this man is in a different class of thief than that of the starving Jean Valjean about which Victor Hugo wrote in his epic *Les Miserables.*

America has its own wealth of hoodlums. The criminal element is one of the very few things America need not import. While countless thousands of immigrants, year in and year out, show their gratitude to America by becoming productive, law-abiding, and, very often, prodigious members of society, Defendant Qadeer has decided not to incorporate himself into those esteemed ranks. This is all too unfortunate for all parties concerned.

In the opinion of the Court, Defendant Qadeer knew that he faced deportation when he engaged in the illegal behavior and, for this reason, this Court harbors some doubt as to whether his claims of political persecution are altogether true. Because of this incongruity of reason, this Court can only assume that Defendant Qadeer is one of two things: a liar or a fool. This Court will not reach a conclusion as to which one he actually is but will, instead, leave that determination to the authorities of the I.N.S.

This Court **DIRECTS** the I.N.S. to inform the Court of the disposition it reaches as soon as possible thereafter.